# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| U.S. Securities and Exchange Commission, | |
| *Plaintiff,* | |
| v. | No. 16 Civ ____ |
| Iat Hong, Bo Zheng, and Hung Chin, | |
| *Defendants,* | |
| and | |
| Sou Cheng Lai, | |
| *Relief Defendant.* | |

**16 CV 9947**

## COMPLAINT



RECEIVED
DEC 27 2016
CASHIER'S OFFICE
S.D.N.Y.

Plaintiff Securities and Exchange Commission ("Commission" or "SEC") alleges:

## SUMMARY

1.       This is a fraudulent scheme case involving three Chinese nationals, Iat Hong ("Hong"), Bo Zheng ("Zheng"), and Hung Chin ("Chin") (collectively, the "Defendants") who reaped illegal profits by trading on stolen material nonpublic information.  More specifically, Defendants directly, indirectly, or through or by means of others hacked into the nonpublic networks of two New York-headquartered law firms and stole, through deception, confidential information involving several publicly-traded companies that were engaged in merger and acquisition discussions.  Defendants then used that stolen material nonpublic information to trade securities and reap approximately $3 million in unlawful profits.

2.       By no later than July 31, 2014, Defendants directly, indirectly, or through or by means of others hacked into the nonpublic network of a New York-headquartered firm (hereinafter "Law Firm 1") through deceptive means.   These deceptive means included compromising the user account of a Law Firm 1 Information Technology employee who had access to all other email accounts within Law Firm 1's nonpublic network, including the emails of the chairman of Law Firm 1's mergers and acquisitions practice group (hereinafter "Partner A").

3.       Defendants then directly, indirectly, or through or by means of others stole data from Law Firm 1's nonpublic email server and – on at least two occasions – used the information stolen from Law Firm 1 to purchase shares of companies ahead of public announcements that those companies had entered into agreements to merge.   Law Firm 1 provided confidential representation in connection with both of those transactions with Partner A serving as the lead partner in connection with both of those representations.

4.      First, Law Firm 1 and Partner A provided confidential representation in connection with a contemplated transaction involving InterMune, Inc. ("InterMune"), a bio-technology company, ahead of an August 24, 2014 announcement that InterMune had been acquired.  Partner A's emails contained specific confidential material nonpublic information concerning that contemplated InterMune transaction.

5.      In August 2014, Defendants Hong and Zheng used the material nonpublic information contained in Partner A's email to purchase InterMune shares.  Defendants Hong and Zheng sold their InterMune shares after the August 24, 2014 announcement for total illegal profits of over $393,000.

6.      Second, Law Firm 1 and Partner A provided confidential representation in connection with material nonpublic discussions between Intel Corporation, Inc. ("Intel") and Altera, Inc., a semiconductor company, concerning a possible merger and acquisition transaction. Partner A's emails contained specific confidential material nonpublic information concerning an Intel/Altera transaction.

7.      All of the Defendants used the material nonpublic information contained in Partner A's emails to purchase Altera shares ahead of March 27, 2015 news reports that Intel and Altera were engaged in confidential merger discussions.  Defendants sold their Altera shares for illegal profits of over $1.63 million.

8.      On or about April 6, 2015, Defendants directly, indirectly, or through or by means of others hacked into the nonpublic network of another New York-headquartered firm (hereinafter "Law Firm 2") through deceptive means.  These deceptive means included: obtaining unauthorized access to the user account of a Law Firm 2 Information Technology employee; using that access to breach Law Firm 2's web server; and obtaining unauthorized

access to a Law Firm 2 account that allowed access to Law Firm 2's nonpublic email server, including the emails of the then-head of Law Firm 2's corporate practice group (hereinafter "Partner B").

9.     As with Law Firm 1, Defendants directly, indirectly, or through or by means of others stole data from Law Firm 2's nonpublic email server and – on at least one occasion – Defendants Hong and Chin used information stolen from Law Firm 2 to purchase shares of a company ahead of the public announcement that the company was being acquired via a tender offer.

10.     In particular, Law Firm 2 and Partner B were representing Pitney Bowes, Inc. ("Pitney Bowes") in connection with confidential discussions to acquire Borderfree, Inc. ("Borderfree"), an e-commerce solutions company, through a tender offer.  Partner B's emails contained confidential material nonpublic information concerning the transaction, including a draft transaction agreement.

11.     Defendants Hong and Chin purchased substantial shares of Borderfree from April 29, 2015 to May 5, 2015.  In fact, Defendant Hong and Chin's Borderfree purchases were so significant that – on certain trading days – they represented 25% or more of Borderfree's overall trading volume.

12.     On May 5, 2015, Pitney Bowes and Borderfree publicly announced the transaction.  Borderfree's stock price skyrocketed by over 105% and Defendants Hong and Chin sold their Borderfree shares for unlawful profits nearing $850,000.

13.     Throughout the relevant time period, Defendants traded in other companies that were also engaged in discussions of merger or acquisition transactions in which Law Firm 1 or 2 provided confidential representation.  Defendants' trading in multiple securities that share a

connection to Law Firm 1 or Law Firm 2 indicates that Defendants were trading on material nonpublic information obtained from Law Firm 1 and Law Firm 2.

14.     By knowingly or recklessly engaging in the conduct described in this Complaint, Defendants violated and, unless enjoined, will continue to violate the securities laws.

## JURISDICTION AND VENUE

15.     The Commission brings this action pursuant to the authority conferred by Sections 21(d) and 21A of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. § 78u(d) and 78u-1] to enjoin such transactions, acts, practices, and courses of business, and to obtain disgorgement, prejudgment interest, civil money penalties, and such other and further relief as the Court may deem just and appropriate.

16.     This Court has jurisdiction over this action pursuant to Sections 21(d), 21(e), 21A, and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), 78u-1, and 78aa].

17.     Venue is proper in this district pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa.  Certain of the transactions, acts, practices and courses of business constituting the violations alleged herein occurred within the Southern District of New York and elsewhere and were effected, directly or indirectly, by making use of the means or instruments or instrumentalities of transportation or communication in interstate commerce, or of the mails, or the facilities of a national securities exchange.  For example, Law Firms 1 and 2 are headquartered in New York, New York and Partners A and B worked in their firms' respective Manhattan offices.  Further, Defendants' trades were executed in many instances on platforms that are operated by Manhattan broker-dealers and exchanges.  Finally, one of the issuers traded by certain of the Defendants was headquartered in this district.

## DEFENDANTS

18.    **Iat Hong ("Hong")** is 26 years old and resides in the Macau Special Administrative Region of the People's Republic of China ("Macau").  Hong used four brokerage accounts in connection with the scheme.  Three of these four accounts were held at Interactive Brokers ("IB"), a U.S. online brokerage firm.  Defendant Hong accessed the Interactive Brokers accounts through corresponding accounts at Hong Kong-based broker-dealer Sun Hung Kai Investment Services, Inc. ("SHK") via an introducing relationship that SHK had with Interactive Brokers.  Of the three IB accounts, one was a cash account in his name with an account number ending in *6749 (hereinafter "Hong cash account") while the other two accounts were in his mother's name, Sou Cheng Lai: (i) a cash account used from approximately April 2014 – December 2014 with an account number ending in *5376 and (ii) a margin account used beginning in approximately January 2015 with an account number ending in *2615 (together, the "Hong/Lai accounts").   Hong had full trading authority over the Hong/Lai accounts and controlled them.  The fourth account used by Hong in the scheme was an account held in Hong's name with an account number ending in *1999 at BOCI Securities Limited ("BOCI"), a Hong Kong-based broker-dealer.  Hong was able to access the U.S. markets in the BOCI account through BOCI's U.S. based clearing firm.[1]  On his BOCI account application, Defendant Hong represented that his employer was a Chinese company whose name was translated as "Zhuhai City Smart Airflow Co., Ltd." and describes the nature of the company's business as "IT," which upon information and belief, reflects the common English abbreviation for "Information

---

[1]    In addition to the accounts identified above, the Commission has identified the following additional accounts held by Hong: SHK accounts ending in *3220 and *4618, a Tai Fung Bank account ending in *688-6, and Bank of China (Hong Kong) accounts ending in *577-8 and *781-7.  4.  In addition, the Commission has identified the following additional accounts held by Lai: SHK accounts ending in *3255 and *3506 and Tai Fung Bank accounts ending in *228-2 and *736-3.

Technology.   Defendant Hong made approximately $1.4 million in illegal profits from his participation in the fraudulent scheme.

19.    **Bo Zheng ("Zheng")** is 30 years old and resides in Changsha, China.   Zheng obtained a Master of Science in Petroleum Engineering from the University of Tulsa in approximately 2010.   Zheng used three brokerage accounts in his name in connection with the fraudulent scheme: an online Scottrade cash account ending in *0256; a BOCI margin account ending in *1975; and a CMB Int'l Securities Ltd. ("CMB") account ending in *2716.  CMB, like BOCI, is a Hong Kong-based broker-dealer.  For the BOCI and CMB accounts, Zheng was able to access the U.S. markets through BOCI's and CMB's respective U.S.-based clearing firms.[2] According to his BOCI brokerage account documents, Zheng is employed at a company with a translated name that is virtually identical to the name of Hong's employer and the nature of the company's business is described as "IT," which, upon information and belief, reflects the common English abbreviation for "Information Technology."   Moreover, Zheng opened his BOCI account on the same day that Hong opened his BOCI account.  Zheng made approximately $500,000 in illegal profits from his participation in the fraudulent scheme.

20.    **Hung Chin ("Chin")** is 50 years old and is associated with addresses in Hong Kong and Macau.  He lists on his brokerage account opening documents a work address in Macau that is identical to the home address of Hong and Sou Cheng Lai.[3]  According to his brokerage account opening documents, Chin is the Chief Executive Officer of a Chinese company, and describes the nature of the company's business as "IT," which, upon information

---

[2]     In addition to the accounts identified above, the Commission has identified the following additional accounts held by Zheng: a China Merchant Bank (HK Branch) account ending in *2232, and China Merchant Bank accounts ending in *0597 and *0204.

[3]     In addition to the accounts identified above, the Commission has identified an additional account held by Chin at Bank of China (Hong Kong) ending in *684-4.

and belief, reflects the common English abbreviation for "Information Technology."  Chin used a BOCI account ending in *6696 in his own name in connection with the fraudulent scheme. Chin was able to access the U.S. markets through BOCI's U.S.-based clearing firm.  Defendant Chin made slightly over $1 million in illegal profits from his participation in the fraudulent scheme.

## RELIEF DEFENDANT

21.    **Sou Cheng Lai ("Lai")** is 47 years old and resides in Macau.  According to brokerage account documentation, she is Hong's mother.  Lai is named as a Relief Defendant because her accounts received illegal profits from Defendant Hong's trading as part of the fraudulent scheme.

## HACKED LAW FIRM NETWORKS AND RELATED INDIVIDUALS AND ENTITIES

22.    Law Firm 1 is headquartered in New York City with offices throughout the United States, Europe, and Asia.  Law Firm 1 is well-known for providing representation in connection with mergers and acquisitions.  Here, Law Firm 1 provided representation on at least two transactions where – when the transactions were announced – the companies' share prices surged dramatically.

23.    Law Firm 2 is headquartered in New York City with an overseas office.  Law Firm 2 is well-known for providing representation in connection with mergers and acquisitions. Here, Law Firm 2 provided representation on at least one transaction where – when the transaction was announced – the company's share price surged dramatically.

24.    During the relevant period, Partner A was a Partner at Law Firm 1 and chaired Law Firm 1's mergers and acquisition practice group.

25.     During the relevant period, Partner B was a Partner at Law Firm 2 and chaired Law Firm 2's corporate practice group.

26.     InterMune, Inc. ("InterMune") was a California-based biotechnology company that was listed on the NASDAQ under the ticker symbol ITMN.  InterMune was acquired by Roche Holding AG in a deal that was announced on August 24, 2014.  Partner A and Law Firm 1 provided representation to another party that expressed interest in acquiring InterMune during the relevant time period.

27.     Altera Corporation ("Altera") was a California-based computer chip manufacturer that was listed on the NASDAQ under the ticker symbol ALTR.  Altera merged with Intel Corporation in a deal that was announced on June 1, 2015.  Rumors of the merger surfaced in the media on March 27, 2015.  Partner A and Law Firm 1 provided representation in connection with the Intel-Altera merger.

28.     Borderfree, Inc. ("Borderfree") was a Manhattan-based e-commerce company that was listed on the NASDAQ under the ticker symbol BRDR.  Pitney Bowes, Inc. acquired Borderfree in a tender offer that was announced on May 5, 2015.  Partner B and Law Firm 2 provided representation in connection with the tender offer.

## FACTS

### Defendants' Trading Strategy Focuses On Upcoming Mergers and Acquisitions and Other Sources of Information

29.     As early as March 2014, Defendants Hong and Zheng communicated about trading in U.S. listed stocks and noted the importance of merger and acquisition announcements that would cause a company's stock price to increase considerably.

30.     Specifically, Defendant Zheng emailed a PowerPoint presentation to Defendant Hong on March 28, 2014.  The presentation was titled "Internal Information of US Stock

Operations" and explained that "[t]he goal is to improve US stock operations and to seize the right time to buy and sell stocks." One of the slides explicitly stated that "[w]e should focus on a company's . . . M&A [mergers and acquisitions] news . . ., which usually would cause the stock price to fluctuate significantly within a short period."

31.    This same PowerPoint presentation also contained a slide indicating that Defendants Zheng and Hong had information about certain companies that was nonpublic. For example, one of the slides noted that one particular company had several new technology products that had not yet been disclosed publicly and explicitly identified one product from that company that would be announced in the 2014-2015 timeframe.

**Defendants Target Law Firm 1 as a Source Of Material Nonpublic Information about Mergers and Acquisitions**

32.    By no later than July 2014, Defendants began targeting Law Firm 1 as a source of material nonpublic information.

33.    On July 21, 2014, Defendant Zheng sent Defendant Hong an email with a Chinese subject that translates to "[Law Firm 1] analysis template," and attached a spreadsheet. The spreadsheet contained information about two merger and acquisition transactions that were completed in 2012.

34.    Law Firm 1 and Partner A represented parties involved in the deals. The spreadsheet also listed stock prices for the companies involved in the deals, including their prices immediately before and immediately after the deals were made public.

35.    On July 29, 2014, Defendant Hong emailed Defendant Chin a Word document titled "New York.docx." The document listed the names of eleven partners at Law Firm 1 in Law Firm 1's New York, Washington, D.C., Silicon Valley, and Hong Kong offices. All but one

of the partners was in Law Firm 1's mergers and acquisitions or private equity practice groups.
Partner A was first on the list.

### The Law Firm 1 Hack

36.     By no later than July 31, 2014, Defendants directly, indirectly, or through or by
means of others hacked into Law Firm 1's nonpublic network through deceptive means that
included:

> a. Installing malware on servers in Law Firm 1's network. "Malware" is software
>    that is intended to damage or disable computers and computer networks, or to
>    circumvent installed security and access controls.
>
> b. Using the malware to obtain broad access to nonpublic aspects of Law Firm 1's
>    network, including broad access to Law Firm 1's nonpublic email systems.
>
> c. Compromising the user account of a Law Firm 1 Information Technology
>    employee (hereinafter "Law Firm 1 IT employee"). Law Firm 1 IT employee had
>    exceptional credentials that provided access to all other email accounts within
>    Law Firm 1's nonpublic network.
>
> d. Posing as Law Firm 1 IT employee and using his exceptional credentials to gain
>    access to all of Law Firm 1's nonpublic email accounts, including the email
>    accounts of Law Firm 1 merger and acquisition partners (such as Partner A).
>
> e. Engaging in additional deceptive acts to conceal the breach of the nonpublic
>    network, including disguising the activity as typical network traffic. As a result,
>    Law Firm 1's security systems did not recognize the deceptive breach.

37.     On the evening of July 31, 2014 and the following day, August 1, 2014,
Defendants directly, indirectly, or through or by means of others stole approximately 6.05

gigabytes of data from Law Firm 1's nonpublic network and transmitted that data to a remote internet location.

38.     One gigabyte of data equals approximately 100,000 printed pages and – based on that ratio – the amount of data stolen equaled approximately 605,000 printed pages of Law Firm 1 data.

39.     From August 1, 2014 through September 12, 2014, Defendants directly, indirectly, or through or by means of others stole an additional approximately 53 gigabytes of data from Law Firm 1's nonpublic network and transmitted that data to a remote internet location.  This equaled approximately 5.3 million printed pages of Law Firm 1 data.

### Defendants Hong and Zheng Trade in InterMune Based on Material Nonpublic Information Stolen from Law Firm 1 and Reap Significant Illegal Profits

40.     Defendants Hong and Zheng subsequently used the stolen information noted above to trade in InterMune.

41.     When Defendants Hong and Zheng made their InterMune purchases, there was confidential material nonpublic information in Partner A's emails concerning a potential acquisition of InterMune.  In June 2014, a pharmaceutical company retained Law Firm 1 and Partner A to advise the company in connection with making a confidential bid to acquire InterMune.

42.     On August 1, 2014, the pharmaceutical company's Chief Executive Officer ("CEO") contacted InterMune's CEO to express the pharmaceutical company's interest in acquiring all of InterMune's shares in an all-cash transaction.  The pharmaceutical company then confirmed its interest in an August 4, 2014 letter that stated a specific price-per-share ($67 per share) that the pharmaceutical company was willing to pay for InterMune.

43.     Partner A received the letter in his Law Firm 1 email account as an attachment to an August 7, 2014 email from the pharmaceutical company.  The following day, Partner A used his Law Firm 1 email account to exchange emails with the pharmaceutical company about the potential InterMune bid.  These emails included specific information about the price-per-share that had been offered.

44.     Defendants Hong and Zheng then traded in InterMune based on the material nonpublic information described above.  Beginning on August 13, 2014, Defendant Hong – using both the Hong cash account and Hong/Lai account – purchased shares of InterMune.  From approximately 10:45 a.m. ET through 12:32 p.m. ET on August 13, 2014, Hong purchased 7,500 InterMune shares for approximately $360,000.

45.     Minutes after Defendant Hong completed his purchase of 7,500 InterMune shares on August 13, 2014, various news services reported that InterMune was working with financial advisers to evaluate strategic options as it braced itself for potential takeover interest from larger drug makers.  The reports identified the pharmaceutical company represented by Law Firm 1 and Partner A as a potential acquirer.

46.     The news reports caused InterMune's stock price to increase by approximately $5 per share, or approximately 11%.  The articles did not, however, discuss the price-per-share that the pharmaceutical company Law Firm 1 represented had offered for InterMune.  Moreover, neither InterMune nor the pharmaceutical company confirmed the accuracy of the reports.  Therefore, the material nonpublic information that Defendant Hong and Defendant Zheng had concerning InterMune remained both material and nonpublic.

47.     Defendant Hong purchased an additional 1,000 InterMune shares in the Hong/Lai account on August 13 after the articles were published.

48.     Beginning late on August 16 and continuing into August 17, 2014, Defendants directly, indirectly, or through or by means of others stole approximately ten gigabytes of data from Law Firm 1's nonpublic network, which translates to approximately one million pages.

49.     The next day, August 18, 2014, Defendant Hong purchased an additional 4,500 InterMune shares in the Hong/Lai account.  Defendant Zheng joined him by purchasing 850 InterMune shares in his CMB account ending in *2232.

50.     On August 19, 2014, both Defendants Zheng and Hong purchased more InterMune shares – with Defendant Zheng purchasing 950 shares in his CMB account ending in *2232 and Defendant Hong purchasing 400 shares in the Hong cash account.

51.     On August 21, 2014, Defendant Hong purchased an additional 2,800 InterMune shares in the Hong cash account.  In total – from August 13 through August 21 – Defendants Hong and Zheng purchased a total of 18,000 InterMune shares, spending over $920,000 to do so.

52.     On August 24, 2014, InterMune announced that it had been acquired by Roche Holding AG, a German pharmaceutical company, in an all cash transaction at $74 per share. InterMune's stock price increased by approximately $19 per share, or approximately 40%.

53.     Defendants Hong and Zheng subsequently sold their combined 18,000 InterMune shares for total illegal profits of over $393,000.  In particular, Defendant Hong illegally profited by approximately $360,000 while Defendant Zheng illegally profited by approximately $35,000.

**Defendants Use Additional Confidential Information Stolen from Law Firm 1 to Trade**

54.     On August 13, 2014 – the same day Defendant Hong began purchasing InterMune shares – Defendant Hong began purchasing shares in a biopharmaceutical company and an entertainment company and, five days later, in a specialty pharmaceutical company.  These three companies shared one thing in common with each other and InterMune:  Law Firm A was

14

providing confidential merger and acquisition representation in connection with possible transactions involving each of the companies.

55.     Defendants Zheng and Chin subsequently purchased shares in some of these companies, and Defendants' trading in the biopharmaceutical company continued into December 2014.

56.     While none of these other three companies ever consummated the merger and acquisition transactions for which Law Firm 1 provided representation, Defendants – upon information and belief – traded in these companies based on stolen information from Law Firm 1 concerning potential deals involving these companies.

### Defendants Trade in Altera Based on Material Nonpublic Information Stolen from Law Firm 1's Network and Reap Significant Illegal Profits

57.     Between January 7, 2015 and February 9, 2015, Defendants again directly, indirectly, or through or by means of others continued to access Law Firm 1's nonpublic network through deceptive means and stole data containing confidential material nonpublic information and transmitted that data to a remote internet location.   Defendants then used the material nonpublic information to unlawfully trade in Altera, reaping enormous profits.

58.     During this time, Intel had retained Law Firm 1 to represent it as lead merger and acquisition counsel in confidential discussions to acquire Altera.  Partner A served as the lead partner on this representation.  Indeed, on January 29, 2015, Partner A received in his Law Firm 1 email account the final version of a January 27, 2015 letter from Intel to Altera in which Intel expressed an interest in acquiring Altera.   That letter included specific proposed pricing information.

59.     After January 29, 2015, Partner A represented Intel in confidential material nonpublic discussions concerning the transaction.  On February 2, 2015, for example, Partner A

participated in confidential discussions with Altera in which Intel offered to purchase Altera for $50 per share, and Altera countered with $65 per share. On February 4, 2015, Partner A met with Intel and its advisors concerning how to respond to Altera's $65 per share counterproposal. On February 8, 2015, Partner A exchanged emails with Intel representatives in which they continued to discuss a purchase price.

60.     Beginning on February 17, 2015, Defendants made substantial and aggressive purchases of Altera based on the material nonpublic information noted above.

61.     From February 17, 2015 to March 27, 2015, Defendants purchased a total of over 207,000 Altera shares for approximately $7.5 million. Moreover – on the twenty-nine trading days covered by the February 17, 2015 to March 27, 2015 period – Defendants purchased Altera stock on every trading day except for two.

62.     Throughout this period, Defendants wired significant amounts of money into their respective brokerage accounts to fund this massive trading. But even with those significant wires of cash into the accounts, Defendants bought large amounts of Altera shares on margin. "Buying on margin" is the practice of borrowing money to purchase securities, and as such, can be extremely risky. Buying on margin also subjects a trader to additional costs such as the interest payment for use of the borrowed money.

63.     In fact, Defendant Hong (in the Hong/Lai account) – on three separate occasions – traded so heavily in Altera that he exceeded the permissible amounts he was allowed to borrow. As a result, Hong's brokerage firm automatically sold approximately $130,000 worth of Altera shares from the account to bring it into margin compliance.

64.     Defendants Zheng and Chin similarly engaged in margin trading to purchase Altera stock in their respective BOCI accounts ending in *1975 and *6696.  Defendant Hong also used his BOCI account ending in *1999 to purchase Altera shares during this period.

65.     On March 27, 2015, various news services reported that Intel and Altera were in confidential merger discussions.  On the announcement, Altera's stock price increased approximately $9 per share, or about 30%.

66.     By April 15, 2015, Defendants sold their Altera shares for total illegal profits of over $1.63 million.  In particular, Defendant Hong illegally profited by approximately $600,000; Defendant Chin illegally profited by approximately $600,000; and Defendant Zheng illegally profited by over $450,000.

### The Law Firm 2 Hack

67.     On or about April 6, 2015, Defendants directly, indirectly, or through or by means of others hacked into Law Firm 2's nonpublic network through deceptive means that included:

    a.  Compromising the user account and password of a Law Firm 2 Information Technology employee.

    b.  Using the compromised credentials of the Law Firm 2 Information Technology employee to access Law Firm 2's broader nonpublic network.

    c.  Placing malware on a Law Firm 2 server (hereinafter "Law Firm 2 web server").

    d.  Instructing the malware placed on the Law Firm 2 web server to download additional malware to the Law Firm 2 web server and store that malware in memory.

    e.  Compromising a Law Firm 2 administrator account that was used to operate and manage Law Firm 2's email server and then posing as a Law Firm 2 administrator

to access Law Firm 2's email server.  An "administrator account" is an account that allows authorized persons to make changes to network systems that will affect other users.  Users of administrative accounts can, for example, change security settings, install software and hardware, and access all aspects of a nonpublic network.

f.  Engaging in additional deceptive acts to conceal the breach of Law Firm 2's nonpublic network, including disguising the malware as a harmless and routine Google update service and renaming email files stolen from Law Firm 2's email server so that the files would appear as ordinary network graphics files.

68.  The deceptive compromise of the Law Firm 2 administrator account allowed access to Law Firm 2's email server, including the emails of Partner B – who headed Law Firm 2's corporate practice group.

69.  On seven separate occasions from April 28, 2015 to July 31, 2015, Defendants directly, indirectly, or through or by means of others stole a total of approximately seven gigabytes of compressed data from Law Firm 2's nonpublic network and transmitted that data to a remote internet location.

70.  "Compressed data" represents files that have been reduced in size to increase the speed of transmitting those files from one computer to another.  Thus, the total volume of actual data obtained was likely far larger than seven gigabytes, or greater than 700,000 printed pages.

**Defendants Hong and Chin Trade in Borderfree Based on Material Nonpublic Information Stolen from Law Firm 2 and Reap Significant Illegal Profits**

71.  Defendants directly, indirectly, or through or by means of others stole data from Law Firm 2's nonpublic network three times on April 28 and 29, 2015.  The specific times and amounts of data stolen in each breach are reflected in the chart below:

| Date | Time (ET) | Compressed Data Amount |
|------|-----------|------------------------|
| 4/28/2015 | 10:55 p.m. | 860 megabytes |
| 4/29/2015 | 1:22 a.m. | 380 megabytes |
| 4/29/2015 | 1:35 a.m. | 76 megabytes |

72.     In December 2014, Pitney Bowes, Inc. ("Pitney Bowes") retained Law Firm 2 to represent it in merger and acquisition discussions.   Partner B was the lead partner on this representation.

73.     As of the time of the first breach on April 28, 2015, Law Firm 2 represented Pitney Bowes in final-stage tender offer discussions to acquire Borderfree.   Partner B was the lead partner on that deal.   Partner B's Law Firm 2 email account contained confidential material nonpublic information concerning the transaction.   In particular, attached to one of Partner B's emails from April 25, 2015 was a draft exclusivity agreement in connection with "a potential acquisition" of Borderfree by Pitney Bowes.

74.     Defendants Hong and Chin subsequently traded in Borderfree hours after the last April 29 breach based on the material nonpublic information described above.

75.     On April 29, 2015 beginning at approximately 10:00 a.m. ET, Defendant Chin purchased 10,000 Borderfree shares in his BOCI account ending in *6696.  About ninety minutes later, Defendant Hong purchased 8,000 Borderfree shares in the Hong/Lai account.  These shares cost approximately $120,000 total and Defendant Hong and Chin's trades occurred less than twelve hours after data was stolen from Law Firm 2.

76.     After April 29, 2015 and continuing through May 5, 2015, Defendants Chin and Hong continued purchasing significant numbers of Borderfree shares.  Chin purchased his shares

19

in his BOCI account ending in *6696, while Hong purchased his shares in the Hong/Lai margin account.  In fact – and as reflected by the chart below – Defendants Hong and Chin purchased Borderfree so aggressively that their purchases constituted a significant percentage of the stock's daily trading volume between April 29, 2015 and May 5, 2015:

| Date | Defendant Hong's Purchases | Defendant Chin's Purchases | Total Trading Volume | Defendants' Combined Percentage of Trading Volume |
|---|---|---|---|---|
| 4/29/2015 | 8,000 | 10,000 | 72,806 | 25% |
| 4/30/2015 | 10,000 | 13,000 | 153,005 | 15% |
| 5/1/2015 | 12,000 | 15,000 | 100,450 | 27% |
| 5/4/2015 | 10,000 | 10,000 | 154,784 | 13% |
| 5/5/2015 | 16,000 | 9,000 | 279,867 | 9% |

77.    In total, Defendants Hong and Chin purchased 113,000 Borderfree shares for approximately $730,000.  When Borderfree announced its merger with Pitney Bowes on May 5, 2015, Borderfree's stock price increased by approximately $7 per share — skyrocketing by approximately 105%.

78.    Defendants Hong and Chin sold their Borderfree shares for a combined illegal profit of nearly $850,000, with Hong illegally profiting by over $418,000 and Chin illegally profiting by approximately $430,000.

**Defendants Trade in Additional Companies in Which Law Firm 2 Provided Confidential Representation**

79.     As they had in connection with Law Firm 1, Defendants traded in the shares of additional companies that were engaged in confidential merger and acquisition discussions for which Law Firm 2 provided representation.

80.     For example – prior to the Pitney Bowes/Borderfree merger announcement – Defendants Hong and Chin purchased small amounts of Pitney Bowes shares in addition to their purchases of Borderfree.  This trading indicates that Defendants Hong and Chin knew the identities of both parties in the transaction.

81.     From May 1, 2015 to the end of the year, Defendants opened stock positions in a total of eight companies (other than Borderfree) that were either existing clients of Law Firm 2 and/or companies that Law Firm 2 had represented or was representing in connection with merger and acquisition transactions involving those companies.  Partner B was involved in the representation of seven of the eight companies.  These companies were also from varied sectors, as one was an energy services company while the other was an engineering equipment manufacturer.

82.     In particular, two of those companies were ones in which Law Firm 2 had provided or was providing confidential representation in connection with merger or acquisition discussions.  Partner B worked on the representations involving both of those companies.

**Defendants Were Involved in an Additional Hack Using Same Internet Protocol Addresses Associated with the Law Firm 1 and Law Firm 2 Hacks**

83.     During the relevant period, Defendants demonstrated an interest in robotic vacuums and robot engineering generally.  First, Defendants exchanged numerous emails from at least June 2014 through at least June 2015 concerning robotic vacuums.

84.     Second, in the spring of 2016, Defendant Hong posted to the Internet a series of videos related to robot engineering.  One of these videos listed the name of a company with a virtually identical name to the employer that both Defendants Hong and Zheng listed on their respective BOCI brokerage accounts that they opened on the same day.

85.     By August 2014 and continuing through at least late March 2015, a U.S. Robotics Company was the victim of several computer hacking attacks.  At least one email, which was received by all three Defendants, had attachments depicting proprietary and confidential schematic designs of a robotic vacuum manufactured by the U.S. Robotics Company.  Upon information and belief, Defendants obtained this proprietary information from the U.S. Robotics Company by directly, indirectly, or through or by means of others hacking into the nonpublic network of the U.S. Robotics Company.

86.     The same internet protocol addresses used for the late March 2015 hack of the U.S. Robotics Company overlapped with the hacks of Law Firm 1 and Law Firm 2.  An internet protocol address ("IP address") is a unique number required for online activity conducted by a computer or other device connected to the Internet.  In simple terms, it is like a return address on a letter and identifies a device accessing the Internet.

87.     Here, malware used in connection with the late March 2015 hack of the U.S. Robotics Company and the early April 2015 Law Firm 2 hack emanated from the same IP address.  Moreover – in between the late March 2015 hack of the U.S. Robotics Company and the early April 2015 Law Firm 2 hack – that same IP address was used to interface with Law Firm 1's nonpublic network.

88.     Furthermore, additional malware used in connection with the late March 2015 hack of the U.S. Robotics Company emanated from the same IP address to which stolen data was sent from the Law Firm 2 hack.

## FIRST CLAIM FOR RELIEF

### Violations of § 10(b) of the Exchange Act and Rule 10b-5 Thereunder
### (Against All Defendants)

89.     The Commission realleges and incorporates by reference each and every allegation in paragraphs 1 through 88, inclusive, as if fully set forth herein.

90.     By engaging in the conduct described above, Defendants knowingly or recklessly, in connection with the purchase of securities, directly or indirectly, by use of the means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange:

(a) employed devices, schemes or artifices to defraud;

(b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

(c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any person in connection with the purchase or sale of any security.

91.     By engaging in the foregoing conduct Defendants violated, and unless enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5], thereunder.

## SECOND CLAIM FOR RELIEF

**Violation of Section 14(e) of the Exchange Act and Rule 14e-3 Promulgated Thereunder (Against Defendants Hong and Chin Only)**

92.     The Commission realleges and incorporates by reference each and every allegation in paragraphs 1 through 88, inclusive, as if fully set forth herein.

93.     By April 29, 2015, substantial steps had been taken to commence a tender offer for the securities of Borderfree, including, among others:  the retention of law firms to engage in confidential tender offer discussions and the exchange of draft transaction documents.

94.     At the time Defendants Hong and Chin began purchasing Borderfree stock on April 29, 2015, they were in possession of material information regarding the tender offer for Borderfree securities, which they knew or had reason to know was nonpublic, and which they knew or had reason to know was acquired directly or indirectly from a person acting on behalf of a company involved in the transaction, namely Law Firm 2 and Partner B.

95.     By engaging in the foregoing conduct, Defendants Hong and Chin violated, and unless enjoined will continue to violate, Section 14(e) of the Exchange Act [15 U.S.C. §78n(e)] and Rule 14e-3 [17 C.F.R. §240.14e-3] thereunder.

## THIRD CLAIM FOR RELIEF

**Aiding and Abetting Violations of § 10(b) of the Exchange Act and Rule 10b-5 Thereunder (Against All Defendants)**

96.     The Commission realleges and reincorporates paragraphs 1 through 88, inclusive, as if fully set forth herein.

97.     By engaging in the conduct described above, Defendants knowingly or recklessly provided substantial assistance in connection with violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5], thereunder.

## FOURTH CLAIM FOR RELIEF

### Violations of 20(b) of the Exchange Act
### (Against All Defendants)

98.     The Commission realleges and incorporates by reference each and every allegation in paragraphs 1 through 88, inclusive, as if fully set forth herein.

99.     By engaging in the foregoing conduct, Defendants violated Section 20(b) of the Exchange Act [15 U.S.C. §78t(b)] by engaging in conduct, through or by means of others, that violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule l0b-5 [17 C.F.R. § 240.10b-5] thereunder.

100.    By engaging in the foregoing conduct, Defendants violated, and unless enjoined will continue to violate Section 20(b) of the Exchange Act [15 U.S.C. §78t(b)] .

### Disgorgement by Relief Defendant Sou Cheng Lai

101.    The Commission realleges and reincorporates paragraphs 1 through 100, inclusive, as if fully set forth herein.

102.    Relief Defendant Sou Cheng Lai received unlawful proceeds arising from the violations alleged herein by Defendant Hong.

103.    Relief Defendant Sou Cheng Lai should be compelled to return any unlawful proceeds still held by her as a result of Defendant Hong's violations alleged herein.

### PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests that this Court:

### I.

Enter an order temporarily restraining and enjoining Defendants, their officers, agents, servants, employees, attorneys, and those persons in active concert or participation with Defendants who receive actual notice of the Order, by personal service or otherwise, from,

directly or indirectly, violating Sections 10(b) and 20(b) of the Exchange Act [15 U.S.C. §78j(b) and §78t(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

## II.

Enter an order temporarily restraining and enjoining Defendants Hong and Chin, their officers, agents, servants, employees, attorneys, and those persons in active concert or participation with Defendants Hong and Chin who receive actual notice of the Order, by personal service or otherwise, from, directly or indirectly, violating Section 14(e) of the Exchange Act [15 U.S.C. §78n(e)] and Rule 14e-3 thereunder [17 C.F.R. §240.14e-3];

## III.

Enter an order freezing the assets of Defendants and Relief Defendant and all assets under their control;

## IV.

Enter an order requiring Defendants and Relief Defendant to return to the United States any proceeds derived from the fraudulent scheme alleged herein that have been transferred abroad and those proceeds which are returned to be frozen in a domestic bank during the pendency of this action to preserve such assets for the satisfaction of disgorgement;

## V.

Enter an order restraining and enjoining Defendants and Relief Defendant, their officers, agents, servants, employees, attorneys, and those persons in active concert or participation with Defendants or Relief Defendant who receive actual notice of the Order, by personal service or otherwise, from destroying, mutilating, concealing, altering, disposing, or transferring custody of any items, including but not limited to any books, records, documents, correspondence, contracts, agreements, assignments, obligations, tape recordings, computer media or other property relating to Defendants or Relief Defendant or the fraudulent scheme alleged herein;

**VI.**

Enter an order, pursuant to Rule 4(f)(3) of the Federal Rules of Civil Procedure, directing service of the summons and complaint upon Defendants Zheng and Chin and Relief Defendant by any internationally agreed means of service that is reasonably calculated to give notice, such as those authorized by the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents, or by any other means of alternative service not prohibited by international agreement;

**VII.**

Issue findings of fact and conclusions of law that Defendants committed the violations charged and alleged herein;

**VIII.**

Enter an order permanently restraining and enjoining Defendants and their officers, agents, servants, employees, attorneys, and those persons in active concert or participation with Defendants who receive actual notice of the Order, by personal service or otherwise, from, directly or indirectly, violating Sections 10(b) and 20(b) of the Exchange Act [15 U.S.C. §78j(b) and §78t(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

**IX.**

Enter an order permanently restraining and enjoining Defendants Hong and Chin and their officers, agents, servants, employees, attorneys, and those persons in active concert or participation with Defendants Hong and Chin who receive actual notice of the Order, by personal service or otherwise, from, directly or indirectly, violating Section 14(e) of the Exchange Act [15 U.S.C. §78n(e)] and Rule 14e-3 thereunder [17 C.F.R. §240.14e-3];

**X.**

Issue findings of fact and conclusions of law that Relief Defendant is in possession of illegally obtained funds to which she has no legitimate claim;

**XI.**

Enter an order requiring Defendants, including Relief Defendant, to disgorge, with prejudgment interest, the ill-gotten gains or unjust enrichment derived from the fraudulent scheme alleged herein;

**XII.**

Enter an order imposing on Defendants a civil penalty up to three times the profits made pursuant to Section 21A of the Exchange Act [15 U.S.C. § 78u-l] or, alternatively, to pay a civil penalty under Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)];

**XIII.**

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure to carry out the terms of all orders and decrees that may be entered or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court; and

**XIV.**

Grant such other and further relief as this Court may deem just, equitable, or necessary to enforce the federal securities laws and for the protection of investors.

## DEMAND FOR JURY TRIAL

A jury trial is demanded on all issues so triable.

Dated:   December 27, 2016

Respectfully submitted,

Jennie B. Krasner (JK-0107)
U.S. Securities and Exchange Commission
100 F Street, N.E.
Washington, DC 20549
(202) 551-4708
krasnerj@sec.gov

Britt Biles (*pro hac vice admission pending*)
U.S. Securities and Exchange Commission
100 F Street, N.E.
Washington, DC 20549
(202) 551-4779
bilesb@sec.gov
Attorney for Plaintiff
Securities and Exchange Commission

Of Counsel:
Antonia Chion
Ricky Sachar
Devon Staren
Cheryl Crumpton
U.S. Securities and Exchange Commission
100 F Street, N.E.
Washington, DC 20549