JUDGE CAPRONI

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| U.S. Securities and Exchange Commission, | No. 16 Civ _____ |
| *Plaintiff,* | **FILED UNDER SEAL** |
| v. | |
| Iat Hong, Bo Zheng, and Hung Chin, | 16 CV 9947 |
| *Defendants,* | |
| Sou Cheng Lai | |
| *Relief Defendant.* | |

### LOCAL RULE 6.1 DECLARATION OF RICKY SACHAR IN SUPPORT OF SECURITIES AND EXCHANGE COMMISSION'S *EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ANCILLARY EQUITABLE RELIEF

I, Ricky Sachar, pursuant to 28 U.S.C. §1746, declare as follows:

1. I am a member in good standing of the bars of the state of Maryland and the District of Columbia. I am employed by Plaintiff Securities and Exchange Commission ("SEC" or "Commission") as an Assistant Director in the Division of Enforcement in the Commission's Home Office in Washington, D.C.

2. Except to the extent otherwise stated, I have personal knowledge of the matters set forth in this declaration, and, if called as a witness, I could and would competently testify under oath to the facts stated herein.

3. I make this declaration pursuant to Local Civil Rule 6.1(d) to show that good and sufficient reason exists for bringing the Commission's application for a temporary restraining order and ancillary equitable relief on an *ex parte* basis rather than by notice of motion. No previous application for the relief requested herein or any similar relief has been made.

1

4.      The Commission makes its application *ex parte* to (i) preserve the *status quo* pending adjudication of the application; (ii) ensure that any future judgment of this Court for disgorgement, prejudgment interest, and monetary penalties is not rendered meaningless; (iii) prevent the destruction or fabrication of evidence; and (iv) provide for alternative service of process on foreign defendants and a foreign relief defendant.  The Commission believes that proceeding by notice of motion may jeopardize the Court's ability to grant full and effective relief both on this application and on the merits of the Commission's underlying action.

5.      I, along with Commission Staff working at my direction and under my supervision, conducted an investigation into trading of U.S.-listed companies by Iat Hong, Bo Zheng, and Hung Chin (collectively, "Defendants") in their accounts and in accounts in the name of Relief Defendant Sou Cheng Lai.  In 2014 and 2015, Defendants successfully traded ahead of three mergers and acquisitions ("M&A") announcements and reaped substantial profits when the M&As were publicly announced.

6.      This declaration provides documentary support or attribution for facts that are set forth more fully in the Commission's Complaint, its *Ex Parte* Application For Temporary Restraining Order And Ancillary Equitable Relief, and the memorandum of law in support of that Application.  This Declaration and its accompanying exhibits — along with information obtained in oral interviews conducted by me or Commission staff working at my direction and under my supervision — support the factual assertions contained in the Commission's filings.

### A.  The Defendants and Relief Defendant Accounts

#### a.  Defendant Hong and Relief Defendant Lai's Accounts

7.      Defendant Hong used four brokerage accounts in connection with the scheme, with three of them being held at Interactive Brokers, Inc., a U.S. online brokerage firm.  Based

on information received from Interactive Brokers, Hong accessed the Interactive Brokers accounts through corresponding accounts at a Hong Kong-based broker-dealer, Sun Hung Kai Investment Services, Inc. ("SHK") as a result of an introducing relationship that SHK had with Interactive Brokers.

8.      Attached hereto as Exhibit A is a true and correct copy of Defendant Hong's account opening documents for a Sun Hung Kai Investment Services, Inc. ("SHK") brokerage account ending in *3220.[1]  Included in Exhibit A is a certified translation of the portions of the account opening documents that appear only in Chinese.

9.      I, along with Commission Staff working at my direction and under my supervision, reviewed Defendant Hong's SHK account opening documents, which are attached hereto as Exhibit A.   On the page bates-stamped SEC-HKSFC-E-0000464 of Exhibit A, Defendant Hong designated a Tai Fung Bank account ending in *688-6 as the account into which SHK should pay any money owed to him.

10.     Attached hereto as Exhibit B is a true and correct copy of Defendant Hong's account opening documents for an Interactive Brokers brokerage account ending in *6749.  The document in Exhibit B bates-stamped SEC-IB-E-00000085 identifies Hong as a resident of Macau.  Defendant Hong used the brokerage account ending *6749 in the scheme.  Included in Exhibit B is a certified translation of the portions of the account opening documents that appear only in Chinese.

11.     Attached hereto as Exhibit C is a true and correct copy of Defendant Hong's account opening documents for an Interactive Brokers brokerage account ending in *9328.

---

[1]      Exhibit A, along with all other exhibits hereto, has been redacted pursuant to Federal Rule of Civil Procedure 5.2(a).  Defendants' or Relief Defendants' personal identifying information — the months and days of their births, their passport numbers, and all but the last four digits of their financial account numbers — have been redacted.

12.    Attached hereto as Exhibit D is a true and correct copy of an account statement for Defendant Hong's *9328 account at Interactive Brokers.  The account statement identifies an "account alias" that links the *9328 number to a number ending in *4618.  The *4618 number is believed to be an SHK brokerage account in Defendant Hong's name.

13.    Attached hereto as Exhibit E is a true and correct copy of Defendant Hong's account opening documents for a BOCI Securities Limited ("BOCI") brokerage account ending in *1999, which he opened on December 29, 2014.  Included in Exhibit E is a certified translation of the portions of the account opening documents that appear only in Chinese. Defendant Hong used the BOCI account ending *1999 in the scheme.

14.    On his BOCI account application at the page bates-stamp ending 427, Defendant Hong represented that his employer was a Chinese company whose name was translated as "Zhuhai City Smart Airflow Co., Ltd." and described the nature of the company's business as "IT," which upon information and belief, reflects the common English abbreviation for "Information Technology." Defendant Hong also represented as the company's phone number, his own cell phone number (compare pages bates-stamped ending 426 to 427).

15.    Based on information from BOCI's U.S.-based clearing firm, Defendant Hong was able to access the U.S. markets in the BOCI account through a clearing relationship BOCI had with that U.S.-based clearing firm.

16.    I, along with Commission Staff working at my direction and under my supervision, reviewed Defendant Hong's BOCI account opening documents which are attached hereto as Exhibit E.  On Exhibit E page bates-stamped ending 428, Defendant Hong provided his bank account information.  He listed two Bank of China (Hong Kong) accounts ending in *577-8 and 781-7 as the accounts to which BOCI should transfer withdrawal payments.

4

17.     Attached hereto as Exhibit F is a true and correct copy of account opening documents for an Interactive Brokers brokerage account ending in *5376 that was opened in the name of Defendant Hong's mother, Sou Cheng Lai.  Lai is named in this action as a Relief Defendant.  Included in Exhibit F is a certified translation of the portions of the account opening documents that appear only in Chinese.  Defendant Hong used the account ending *5376 in the scheme.

18.     Attached hereto as Exhibit G is a true and correct copy of account opening documents for an Interactive Brokers brokerage account ending in *2615 that was opened in the name of Relief Defendant Lai.  Included in Exhibit G is a certified translation of the portions of the account opening documents that appear only in Chinese.  Defendant Hong used the account ending *2615 in the scheme.  Together, the accounts ending in *5376 and *2615 are referred to as the "Hong/Lai accounts."

19.     Attached hereto as Exhibit H is a true and correct copy of account opening documents for an SHK brokerage account ending in *3255 that was opened in the name of Relief Defendant Lai.  Included in Exhibit H is a certified translation of the portions of the account opening documents that appear only in Chinese.

20.     Attached hereto as Exhibit I is a true and correct copy of account opening documents for an SHK brokerage account ending in *3506 that was opened in the name of Relief Defendant Lai.  Included in Exhibit I is a certified translation of the portions of the account opening documents that appear only in Chinese.

21.     I, along with Commission Staff working at my direction and under my supervision, reviewed the account opening documents for the SHK brokerage account ending in *3506, which are attached hereto as Exhibit I.  On Exhibit I page bates-stamped ending 270, a

Tai Fung Bank account ending in *228-2 was designated as the account into which SHK should pay any money owed to Relief Defendant Lai.

22.     Attached hereto as Exhibit J is a true and correct copy of a November 2014 Third Party Authorization form in which Relief Defendant Lai gave Defendant Hong authority to trade or operate her SHK brokerage accounts on her behalf.  For example, the document in Exhibit J with the bates stamp ending 179 – in addition to identifying Defendant Hong as Relief Defendant Lai's son – provided Defendant Hong authority over Relief Defendant Lai's brokerage accounts at SHK ending *3255 and *3506, which corresponded to the Interactive Brokers accounts ending *376 and *615.  Included in Exhibit J is a certified translation of the portions of the authorization form that appear only in Chinese.

23.     I, along with Commission Staff working at my direction and under my supervision, reviewed the Third Party Authorization form attached hereto as Exhibit J.  Exhibit J page bates-stamped ending 191 lists a Tai Fung Bank sub-account ending in *736-3 and identifies Defendant Hong as an authorized third-party on the sub-account.

24.     Attached hereto as Exhibit K are true and correct copies of communications between Defendant Hong and a representative of SHK that evidence Defendant Hong's control and trading authority over Relief Defendant Lai's brokerage accounts.  Based on our review of the documents and other information, we believe Defendant Hong is identified as "C" on the translated communications.   Included in Exhibit K is a certified translation of those communications.

b.  Defendant Zheng's Accounts

25.     Defendant Zheng used three brokerage accounts in his name in connection with the scheme.  Based on information from the University of Tulsa, Defendant Zheng obtained a Master of Science in Petroleum Engineering from that university in approximately 2010.

26.     Attached hereto as Exhibit L is a true and correct copy of Defendant Zheng's account opening documents for one of the three accounts Defendant Zheng used in the scheme, a Scottrade brokerage account ending in *0256.  Included in Exhibit L is a certified translation of the portions of the account opening documents that appear only in Chinese.

27.     Attached hereto as Exhibit M is a true and correct copy of Defendant Zheng's December 29, 2014 account opening documents for a BOCI brokerage account ending in *1975. Included in Exhibit M is a certified translation of the portions of the account opening documents that appear only in Chinese.

28.     As reflected by the document bates-ending 446 in Exhibit M, Defendant Zheng represented his employer to be a Chinese company whose name translated as "Zhuhai City Aijia Smart Airflow Co. Ltd" and described the nature of the company's business as "IT," which upon information and belief, reflects the common English abbreviation for "Information Technology." Defendant Zheng also represented the company's phone number to be the same as his own cell phone number (*compare* entries for company phone number and cell phone number at bates-stamped page ending 445).

29.     I, along with Commission Staff working at my direction and under my supervision, reviewed Defendant Zheng's BOCI account opening documents which are attached hereto as Exhibit M.  On Exhibit M page bates-ending in 447, Defendant Zheng provided his

bank account information.  He listed a China Merchant Bank (Hong Kong) account ending in *2232 as an account to which BOCI should transfer withdrawal payments.

30.     Attached hereto as Exhibit N is a true and correct copy of Defendant Zheng's account opening documents for a CMB International Securities Limited ("CMB") brokerage account ending in *2716.  Included in Exhibit N is a certified translation of the portions of the account opening documents that appear only in Chinese.

31.     Based on information from CMB's U.S.-based clearing firm, Defendant Zheng was able to access the U.S. markets in the CMB account through a clearing relationship CMB had with that U.S.-based clearing firm.

32.     Attached hereto as Exhibit O is a true and correct copy of account opening documents and an August 2014 account statement and back up documents for Zheng's China Merchant Bank (Hong Kong) account ending in *2232.  Page 7 of Exhibit O identifies two China Merchant Bank accounts ending in *0204 and *0597 as the source of funds for certain August 2014 transfers that Defendant Zheng made into the account.  Included in Exhibit O is a certified translation of the portions of the account statements that appear only in Chinese.

c.   Defendant Chin's Accounts

33.     Defendant Chin used a brokerage account in his own name in connection with the scheme.  Attached hereto as Exhibit P is a true and correct copy of Defendant Chin's account opening documents for a BOCI brokerage account ending in *6696.  Included in Exhibit P is a certified translation of the portions of the account opening documents that appear only in Chinese.

34.     The document at Exhibit P with the bates-stamp ending 364 identifies two addresses for Defendant Chin, one in Hong Kong and one in Macau.  Based on a comparison of

this document with the account opening documents for Relief Defendant Lai [attached at Exhibit F, page 1], and Defendant Hong [attached at Exhibit B, page 1] the Macau address for Defendant Chin is identical to that of Relief Defendant Lai and Defendant Hong.

35.     The document at Exhibit P with the bates-stamp ending 364 identifies Defendant Chin as the Chief Executive Officer of a Chinese company and describes the nature of the company's business as "IT," which upon information and belief, reflects the common English abbreviation for "Information Technology."

36.     I, along with Commission Staff working at my direction and under my supervision, reviewed Defendant Chin's BOCI account opening documents, which are attached hereto as Exhibit P.  On the page of Exhibit P with the bates-stamp ending in 365, Defendant Chin provided his bank account information.  He listed a Bank of China (Hong Kong) account ending in *684-4 as an account to which BOCI should transfer withdrawal payments.

**B.  Hacked Law Firms**

37.     Based on publicly available information, Law Firm 1 is headquartered in New York City with offices through the United States, Europe, and Asia. Based on information received from Law Firm 1 and publicly available sources, Partner A – during the relevant period – was a partner in Law Firm 1's Manhattan offices and chaired Law Firm 1's M&A practice group.

38.     Based on publicly available information, Law Firm 2 is headquartered in New York City with an overseas office.  Based on information received from Law Firm 2 and publicly available sources, Partner B – during the relevant period – was a partner in Law Firm 2's Manhattan offices and chaired Law Firm 2's corporate practice group.

### C.  Summary of Securities Traded by Defendants

39.    Attached hereto as Exhibit Q is a true and correct copy of a summary of Defendants' and Relief Defendant's trading in the securities of InterMune, Altera, and Borderfree.  This summary was prepared at my direction and under my supervision by Commission staff.

40.    Based on a review of various trading and other records, Defendants and Relief Defendant hold proceeds abroad derived from the fraudulent scheme.  Moreover – based on a review of various trading and other records, Defendants Hong and Zheng – and Relief Defendant Lai – have used U.S. based trading accounts for the scheme and have transferred proceeds derived from the scheme abroad.

### D.  Defendants' Trading Strategy Focuses on Upcoming M&As

41.    On March 28, 2014, Defendant Zheng emailed a Power Point presentation to Defendant Hong.  The presentation was titled "Internal Information of US Stock Operations" and explained that "[t]he goal is to improve US stock operations and to seize the right time to buy and sell stocks."  One of the slides explicitly stated that "[w]e should focus on a company's . . . M&A news . . ., which usually would cause the stock price to fluctuate significantly within a short period."  Moreover, one of the slides noted that a particular company had several new technology products that had not yet been released to the public and explicitly identified one product that the company planned to announce in the 2014-2015 timeframe.

42.    Attached hereto as Exhibit R is a true and correct copy of a March 28, 2014 email and attached Power Point presentation sent from 13507400569@126.com to

10

hongiat@hotmail.com.[2]   Defendant Zheng listed 13507400569@126.com as his email address on the account opening documents for his brokerage accounts.  *See* Exhibits L (document bates-stamped ending 195), M (document bates-stamped ending 445), and N (document bates-stamped ending 175).   Defendant Hong listed the hongiat@hotmail.com as his email address on the account opening documents for his brokerage accounts.  *See* Exhibits A (document bates-stamped ending 461) and E (document bates-stamped ending 426).  Included in Exhibit R is a certified translation of the email and Power Point presentation.

### E.   Defendants Target Law Firm 1 as a Source of Material Nonpublic M&A Information

43.     On July 21, 2014, Defendant Zheng sent Defendant Hong an email with a Chinese subject that translates to "[Law Firm 1] analysis template," and attached a spreadsheet.  The spreadsheet contained information about two M&A transactions that were completed in 2012.  The spreadsheet also listed stock prices for the companies involved in the deals, including their prices immediately before and immediately after the deals were made public

44.     Attached hereto as Exhibit S is a true and correct copy of that July 21, 2014 email and the attached Excel file that were sent from Defendant Zheng's email address to Defendant Hong's email address.  Included in Exhibit S is a certified translation of the email and Excel file.

45.     On July 29, 2014, Defendant Hong emailed Defendant Chin a Word document titled "New York.docx."  The document listed the names of eleven partners at Law Firm 1 in Law Firm 1's New York, Washington, D.C., Silicon Valley, and Hong Kong offices.  Based on information obtained from Law Firm 1 and publicly available information, all but one of the

---

[2]        In the translated email, Iat Hong is addressed as "Xiong Ri."  According to Chinese-speaking staff at the SEC, this is the Mandarin pronunciation of the Chinese characters "熊日", which are pronounced "Iat Hong" in Cantonese.

eleven partners was in Law Firm 1's M&A or private equity practice groups and Partner A was first on the list of eleven partners.

46.     Attached hereto as Exhibit T is a true and correct copy of that July 29, 2014 email and attached Word document that were sent from Defendant Hong's email to hungchin@126.com, which is an email address that Defendant Chin listed as his own on his brokerage account opening documents.  *See* Exhibit P (document bates-stamped ending 363). Included in Exhibit T is a certified translation of the email and Word document.

### F.  Law Firm 1 is Hacked

47.     I, along with Commission Staff working at my direction and under my supervision, obtained information about network intrusions at Law Firm 1 from counsel for Law Firm 1 and/or a cybersecurity vendor retained by Law Firm 1 to investigate the hack of Law Firm 1.

48.     Based on information provided to the Staff by counsel for Law Firm 1 and/or a cybersecurity vendor retained by Law Firm 1 to investigate the hack of Law Firm 1, malware was installed on servers on Law Firm 1's network — by no later than July 31, 2014 — and this malware was used to obtain broad access to nonpublic aspects of Law Firm 1's network, including Law Firm 1's nonpublic email systems.

49.     Based on information provided to the Staff by counsel for Law Firm 1 and/or a cybersecurity vendor retained by Law Firm 1 to investigate the hack of Law Firm 1, a user account belonging to a Law Firm 1 Information Technology ("IT") employee was compromised.  The IT employee had exceptional credentials, so posing as that employee on the network provided access to all other email accounts in Law Firm 1's nonpublic network, including Law Firm 1's M&A partners.

50.    Based on information provided to the Staff by counsel for Law Firm 1 and/or a cybersecurity vendor retained by Law Firm 1 to investigate the hack of Law Firm 1, the deceptive breach of Law Firm 1's nonpublic network was disguised as typical network traffic to avoid detection by Law Firm 1's network security.

51.    Based on information provided to the Staff by Law Firm 1 and/or a cybersecurity vendor retained by Law Firm 1 to investigate the hack of Law Firm 1, as well as the Staff's review of firewall log data provided by Law Firm 1, approximately 6.05 gigabytes of data was stolen from Law Firm 1's nonpublic network on the evening of July 31, 2014 and the morning of August 1, 2014 and transmitted to a remote internet location.  One gigabyte of email equals approximately 100,000 printed pages. http://www.lexisnexis.com/applieddiscovery/lawlibrary/whitePapers/ADI_FS_PagesInAGigabyte.pdf.  Therefore, approximately 605,000 printed pages were stolen from Law Firm 1's nonpublic network.

52.    Based on information provided to the Staff by Law Firm 1 and/or a cybersecurity vendor retained by Law Firm 1 to investigate the hack of Law Firm 1, as well as the Staff's review of firewall log data provided by Law Firm 1, approximately 53 gigabytes of data, or 5.3 million printed pages, was stolen from Law Firm 1's nonpublic network from August 1, 2014 through September 12, 2014 and transmitted to a remote internet location.

### G. Defendants Hong and Zheng Trade in InterMune Based on Material Nonpublic Information Stolen from Law Firm 1

53.    I, along with Commission Staff working at my direction and under my supervision, obtained information from a pharmaceutical company that retained Law Firm 1 to provide representation in connection with a confidential bid to acquire InterMune.  InterMune

was a California-based biotechnology company that was listed on NASDAQ under the ticker symbol ITMN.

54.    Based on information provided to the Staff by counsel for the pharmaceutical company, the pharmaceutical company retained Law Firm 1 and Partner A in June 2014.

55.    Based on information provided to the Staff by counsel for the pharmaceutical company, on August 1, 2014, the pharmaceutical company's Chief Executive Officer ("CEO") contacted InterMune's CEO to express the pharmaceutical company's interest in acquiring InterMune's shares in an all-cash transaction.

56.    Based on information provided to the Staff by counsel for the pharmaceutical company, the pharmaceutical company confirmed its interest in InterMune in an August 4, 2014 letter that stated a specific price-per-share ($67-per-share) that the pharmaceutical company was willing to pay for InterMune.

57.    Based on information provided to the Staff by counsel for Law Firm 1, Partner A received the August 4, 2014 letter in his Law Firm 1 email account as an attachment to an August 7, 2014 email from the pharmaceutical company and, on August 8, 2014, used his Law Firm 1 email account to exchange emails with the pharmaceutical company about the potential InterMune bid.  Those emails included specific information about the price-per-share that had been offered.

58.    As reflected by the InterMune trading summary at Exhibit Q – Defendant Hong, beginning on August 13, 2014, began purchasing InterMune shares.  From approximately 10:45 a.m. ET to 12:32 p.m. ET on August 13, 2014 – again reflected at Exhibit Q – Hong purchased 7,500 InterMune shares for approximately $360,000.

59.     Minutes after Defendant Hong completed his purchase of 7,500 InterMune shares on August 13, 2014, various news services reported that InterMune was working with financial advisers to evaluate strategic options as it braced itself for potential takeover interest from larger drug makers.  Attached hereto as Exhibit U is an example of one of these reports, a true and correct copy of an August 13, 2014 article that appeared in Reuters concerning a potential acquisition of InterMune.

60.     The news reports caused InterMune's stock price to increase by approximately $5 per share, or approximately 11%.  This is reflected at Exhibit Q – and in particular – comparing the price at which Defendant Hong purchased InterMune shares at 12:32 p.m. ET on August 13, 2014 (approximately $49 per share) versus the price at which he purchased InterMune shares at 1:06 p.m. ET on August 13, 2014 (approximately $54 per share).

61.     Certain of these news reports identified the pharmaceutical company (represented by Law Firm 1 and Partner A) as a potential InterMune acquirer.  The news reports did not discuss the price-per-share that the pharmaceutical company had offered for InterMune. Moreover, neither InterMune nor the pharmaceutical company confirmed the accuracy of the reports.  Defendant Hong purchased an additional 1,000 InterMune shares in the Hong/Lai account ending in *5376 on August 13 after the news reports were published.

62.     Based on information provided to the Staff by Law Firm 1 and/or a cybersecurity vendor retained by Law Firm 1 to investigate the hack of Law Firm 1, as well as the Staff's review of firewall log data provided by Law Firm 1, beginning late on August 16 and continuing into August 17, approximately ten gigabytes of data was stolen from Law Firm 1's nonpublic network.

63.     As reflected by the InterMune trading summary at Exhibit Q, Defendants Hong and/or Zheng purchased additional InterMune shares from August 18 – August 21, 2014.

64.     On August 24, 2014, InterMune announced that it had been acquired by Roche Holding AG, a German pharmaceutical company, in an all-cash transaction at $74 per share. Attached hereto as Exhibit V is a true and correct copy of Roche's announcement that made public the InterMune deal.

65.     InterMune's stock price increased by approximately $19 per share, or approximately 40%, on the announcement.  Attached hereto as Exhibit W is a true and correct copy of a price chart for InterMune that shows its price-per-share immediately before and immediately after the August 24, 2014 announcement.

66.     As reflected by the InterMune trading summary at Exhibit Q, Defendants Hong and Zheng subsequently sold their combined 18,000 InterMune shares for profits of over $393,000, with Defendant Hong profiting by approximately $360,000 and Defendant Zheng profiting by approximately $35,000.

### H. Defendants Use Additional Confidential Information Stolen From Law Firm 1 to Trade

67.     The same day that Defendant Hong began purchasing InterMune shares, he also began purchasing shares in a biopharmaceutical company and an entertainment company.  Five days later, Defendant Hong purchased shares in a specialty pharmaceutical company. Defendants Zheng and Chin also purchased shares in some of these companies.

68.     Attached hereto as Exhibit X is a true and correct copy of a summary of Defendants' and Relief Defendant's trading in these three securities.    This summary was prepared at my direction and under my supervision by Commission staff.

69.    The biopharmaceutical company, entertainment company, and specialty pharmaceutical company were involved in potential deals for which Law Firm 1 was providing confidential representation.   The connections between the biopharmaceutical company, entertainment company, and specialty pharmaceutical company and Law Firm 1's M&A practice was confirmed by counsel for the issuers or the companies that were seeking to acquire the issuers in the contemplated transactions.  Moreover, counsel for the issuers or the companies that were seeking to acquire the issuers in the contemplated transactions confirmed that the contemplated transactions were not consummated.

## I.   Defendants Trade In Altera Based On Material Nonpublic Information Stolen From Law Firm 1's Network

70.    Based on information provided to the Staff by counsel for Law Firm 1 and/or the cybersecurity vendor Law Firm 1 retained to investigate the Law Firm 1 hack, additional data was stolen from Law Firm 1's nonpublic network between January 7, 2015 and February 9, 2015 and transmitted to a remote internet location.

71.    I, along with Commission Staff working at my direction and under my supervision, obtained information from Intel concerning its retention of Law Firm 1 to represent Intel as lead M&A counsel in confidential discussions to acquire Altera.  Altera was a California-based computer chip manufacturer that was listed on the NASDAQ under the ticker symbol ALTR.

72.    Based on information provided to the Staff by counsel for Intel, Partner A served as the lead partner on the Altera deal.

73.    Based on information provided to the Staff by counsel for Law Firm 1, Partner A received in his Law Firm 1 email account on January 29, 2015 the final version of a January 27,

2015 letter from Intel to Altera in which Intel expressed an interest in acquiring Altera.  That letter included specific pricing information.

74.     Based on information provided to the Staff by counsel for Intel, Partner A represented Intel after January 29, 2015 in confidential material nonpublic discussions concerning the transaction.  On February 2, 2015, for example, Partner A participated in confidential discussions with Altera in which Intel offered to purchase Altera for $50 per share, and Altera countered with $65 per share.  *See* Exhibit Y, which is a true and correct copy of the chronology of events leading to the Altera acquisition that was provided to the Commission by Intel.

75.     Based on information provided to the Staff by counsel for Intel, Partner A met with Intel and its advisors on February 4, 2015 concerning how to respond to Altera's $65 per share counterproposal.  *See* Exhibit Y.

76.     Based on information provided to the Staff by counsel for Law Firm 1, Partner A exchanged emails on February 8, 2015 with Intel representatives in which they continued to discuss a purchase price.

77.     From February 17, 2015 to March 27, 2015, Defendants purchased a total of over 207,000 Altera shares for approximately $7.5 million.  Moreover, on the twenty-nine trading days in the February 17, 2015 to March 27, 2015 time period, Defendants purchased Altera stock on every trading day except for two (*See* Altera trading summaries in Exhibit Q).

78.     Each of the Defendants – during this period – wired significant amounts of money into their respective brokerage accounts to fund their Altera trading.  But even with those significant wires of money into the accounts, Defendants bought large amounts of Altera shares on margin.

79.     Attached hereto as Exhibit Z is a true and correct copy of account statements for Relief Defendant Lai's Interactive Brokers account, ending in *2615 for the months ending February 2015 and March 2015 that Defendant Hong used to trade Altera shares.  As reflected in Exhibits J and K, Defendant Hong had control and trading authority over this account.

80.     As reflected at page two of the February 2015 brokerage statement contained at Exhibit Z, Defendant Hong wired approximately $124,000 into his account on February 18, 2015.  Then, as reflected at page three of the March 2015 brokerage statement contained at Exhibit Z, Defendant Hong wired the following amounts into his account:

| Date | Amount |
|------|--------|
| 3/2/15 | $152,526.47 |
| 3/17/15 | $65,383.03 |
| 3/19/15 | $218,333.26 |
| 3/25/15 | $23,583.39 |

81.     Notwithstanding the wires noted above, Defendant Hong – on three separate occasions – traded so heavily in Altera that he exceeded the permissible amounts he was allowed to borrow and the brokerage firm automatically sold approximately $130,000 worth of Altera shares from the account to bring it into margin compliance.  Based on information from Interactive Brokers, the first automatic sale – on February 27, 2015 – is reflected at page 2 of the February 2015 brokerage statement in Exhibit Z; the second automatic sale – on March 13, 2015 – is reflected at page 2 of the March 2015 brokerage statement in Exhibit Z; and the final automatic sale – on March 18, 2015 – is reflected at page 2 of the March 2015 brokerage statement in Exhibit Z.

82.     Defendants Zheng and Chin also wired significant amounts of money into certain of their accounts during this period and purchased Altera shares on margin.

83.     Attached hereto as Exhibit AA is a true and correct copy of account statements for Defendant Zheng's BOCI account, ending in *1975 for the months ending February 2015 and March 2015.

84.     As reflected at page two of the March 2015 brokerage statement at Exhibit AA, Defendant Zheng's account was at a negative balance of approximately $300,000.  As reflected at page three of the March 2015 brokerage statement at Exhibit AA – beginning on March 17, 2015 – Defendant Zheng wired a total of approximately $600,000 into his BOCI brokerage account.  Defendant Zheng subsequently purchased Altera shares such that his account went to a negative balance.

85.     Attached hereto as Exhibit BB is a true and correct copy of account statements for Defendant Chin's BOCI account, ending in *6696, for the months ending February 2015 and March 2015.

86.     As reflected at page three of the March 2015 brokerage statement for Defendant Chin at Exhibit BB – as of March 9, 2015 – the account had a negative balance of over $600,000.  On March 12, 2015 – and again as reflected at page three of the March 2015 brokerage statement at Exhibit BB – Defendant Chin wired $300,000 into the brokerage account.  Defendant Chin subsequently purchased Altera shares such that – and as reflected at page four of the March 2015 brokerage statement at Exhibit BB – the account had a negative balance of over $800,000.

87.     On March 27, 2015, various news services reported that Intel and Altera were in confidential merger discussions.  Attached hereto as Exhibit CC is a true and correct copy of a

March 27, 2015 article that appearèd in *The Wall Street Journal* and publicly reported Altera's merger discussions with Intel.  Ultimately, Altera merged with Intel in a deal that was announced on June 1, 2015.

88.     On the announcement, Altera's stock price increased approximately $9 per share, or about 30%.  Attached hereto as Exhibit DD is a true and correct copy of a price chart for Altera that shows its price-per-share immediately before and immediately after the March 27, 2015 announcement.

89.     By April 15, 2015, Defendants sold their total over 207,000 Altera shares for total profits over $1.63 million with Defendant Hong profiting by approximately $600,000; Defendant Chin profiting by approximately $600,000; and Defendant Zheng profiting by over $450,000. *See* Altera Trading Summaries at Exhibit Q.

### J.  Law Firm 2 Hack

90.     I, along with Commission Staff working at my direction and under my supervision, obtained information about network intrusions at Law Firm 2 from counsel for Law Firm 2 and/or cybersecurity vendors retained by Law Firm 2 to investigate the hack of Law Firm 2.

91.     Based on information provided to the Staff by counsel for Law Firm 2 and/or cybersecurity vendors retained by Law Firm 2 to investigate the hack of Law Firm 2, on or about April 6, 2015, a user account and password belonging to a Law Firm 2 IT employee were compromised in the hack.  The compromised credentials were used to pose as a Law Firm 2 IT employee on the network and gain access to Law Firm 2's broader nonpublic network.

92.     Based on information provided to the Staff by counsel for Law Firm 2 and/or cybersecurity vendors retained by Law Firm 2 to investigate the hack of Law Firm 2, malware

was installed on servers on Law Firm 2's network on or about April 6, 2015, and this malware gave the Law Firm 2 web server commands to download additional malware and store it in memory.

93.     Based on information provided to the Staff by counsel for Law Firm 2 and/or cybersecurity vendors retained by Law Firm 2 to investigate the hack of Law Firm 2, a Law Firm 2 administrator account was compromised.  An "administrator account" is an account that allows authorized persons to make changes to network systems that will affect other users.  Users of administrative accounts can, for example, change security settings, install software and hardware, and access all aspects of a nonpublic network.  Here, the compromised credentials allowed access to Law Firm 2's email server, including Partner B who headed Law Firm 2's corporate practice group.

94.     Based on information provided to the Staff by counsel for Law Firm 2 and/or cybersecurity vendors retained by Law Firm 2 to investigate the hack of Law Firm 2, the deceptive breach of Law Firm 2's nonpublic network was disguised as typical network traffic to avoid detection by Law Firm 2's network security.  Specifically, malware was disguised as a routine Google update service and stolen email files were renamed so that they looked like files containing ordinary network graphics.

95.     Based on information provided to the Staff by counsel for Law Firm 2 and/or cybersecurity vendors retained by Law Firm 2 to investigate the hack of Law Firm 2, on seven separate occasions from April 28, 2015 to July 31, 2015, approximately seven gigabytes of compressed data was stolen from Law Firm 2's nonpublic network and transmitted to a remote internet location.  "Compressed data" represents files that have been reduced in size to increase

the speed of transmitting those files from one computer to another. Thus, the total volume of actual data taken was likely far larger than seven gigabytes, or more than 700,000 pages.

### K. Defendants Hong and Chin Trade In Borderfree Based On Material Nonpublic Information Stolen From Law Firm 2

96.    Based on information provided to the Staff by counsel for Law Firm 2 and/or cybersecurity vendors retained by Law Firm 2 to investigate the hack of Law Firm 2, data was stolen from Law Firm 2's nonpublic network three times on April 28 and April 29 of 2015. The specific times and amounts of data stolen in each breach are reflected in the chart below:

| Date | Time (ET) | Amount of Compressed Data |
|------|-----------|---------------------------|
| 4/28/2015 | 10:55 p.m. | 860 megabytes |
| 4/29/2015 | 1:22 a.m. | 380 megabytes |
| 4/29/2015 | 1:35 a.m. | 76 megabytes |

97.    Based on information obtained from Law Firm 2 – at the time of the first breach on April 28, 2015 – Law Firm 2 was representing Pitney Bowes in final-stage tender offer discussions to acquire Borderfree and Partner B was the lead partner on that deal. Borderfree was a Manhattan-based e-commerce company that was listed on the NASDAQ under the ticker symbol BRDR. Based on information obtained from Law Firm 2, Pitney Bowes retained Law Firm 2 in December 2014 to represent it in merger and acquisition discussions.

98.    Attached hereto as Exhibit EE is a true and correct copy of an email produced by Law Firm 2 which concerns the legal representation it provided in connection with the

Borderfree acquisition.  In particular, an April 25, 2015 email contained in Partner B's Law Firm 2 email account circulated a draft Exclusivity Agreement in connection with a "potential acquisition" of Borderfree by Pitney Bowes.

99.     On April 29, 2015 beginning at approximately 10:00 a.m. ET, Defendant Chin purchased 10,000 Borderfree shares in his BOCI account ending in *6696.  About ninety minutes later, Defendant Hong purchased 8,000 Borderfree shares in the Hong/Lai account ending in *2615.  These shares cost approximately $120,000 total and Defendant Hong and Chin's trades occurred less than twelve hours after data was stolen from Law Firm.  Attached at Exhibit FF is a detailed summary chart of Defendant Chin and Hong's Borderfree trading.  This summary was prepared at my direction and under my supervision by Commission staff.

100.    After April 29, 2015 and continuing through May 5, 2015, Defendants Chin and Hong continued purchasing significant numbers of Borderfree shares.  As reflected by a summary chart at Exhibit FF, Defendant Hong and Chin purchased Borderfree so aggressively that their purchases constituted a significant percentage of the stock's trading volume between April 29, 2015 and May 5, 2015.

101.    On May 5, 2015, Borderfree announced its transaction with Pitney Bowes. Attached hereto as Exhibit GG is a true and correct copy of the Form 8-K publicly filed by Borderfree to announce the deal with Pitney-Bowes.

102.    When Borderfree announced its transaction with Pitney Bowes, Borderfree's stock price increased by approximately $7 per share, or approximately 105%.  Attached hereto as Exhibit HH is a true and correct copy of a price chart for Borderfree that shows its price-per-share immediately before and immediately after the May 5, 2015 announcement.

103.     As reflected by the summary charts at Exhibit FF, Defendant Hong and Chin subsequently sold their Borderfree shares for combined profit of nearly $850,000 with Defendant Hong profiting by over $418,000 and Defendant Chin profiting by approximately $430,000.

**L.  Defendants Are Connected To An Additional Hack Using The Same Internet Protocol Addresses Associated With The Law Firm 1 And Law Firm 2 Hacks**

104.     Defendants exchanged numerous emails between June 2014 and June 2015 concerning the development of a robotic vacuum.  Attached hereto as Exhibit II is a certified translation of a sample of those emails.

105.     In April 2016 to May 2016, a YouTube user identified as "Iat Hong" posted to the internet a series of four videos, each one related to a robot.  One of these videos, titled "ROBOT 160406," contains an image with the words "Brief Introduction of Neo Link Robot" just above the name, "Zhuhai Aijia Smart System Ltd."  At my direction, an information technology ("IT") specialist employed by the SEC captured and saved to the SEC's network systems a screenshot of the Iat Hong YouTube page and the associated videos.  A screenshot was taken from the ROBOT 160406 video.  Attached as Exhibit LL is a screenshot of the Iat Hong YouTube page, along with a screenshot of the ROBOT 160406 video, and the IT specialist's declaration.

106.     Based on information obtained by the Staff, a U.S. Robotics Company that manufactures robotic vacuums was the victim of several computer hacking attacks that had begun by August 2014 and continued through at least late March 2015.  This information was provided to Staff by the U.S. Robotics Company and/or a cybersecurity vendor retained by the U.S. Robotics Company to investigate the hack.

107.    At least one email – which was received by all three Defendants – had attachments depicting proprietary and confidential schematic designs of a robotic vacuum manufactured by the U.S. Robotics Company.

108.    Attached hereto as Exhibit JJ is a true and correct copy of a January 12, 2015 email and attached data files sent from an unknown email account to an email account used by Defendant Hong and an email account used by Defendant Chin.  Based on information provided by the U.S. Robotics Company, the attached data files contain proprietary and confidential design schematics for a robotic vacuum manufactured by the U.S. Robotics Company.  Included in Exhibit JJ is a certified translation of the email and data files.

109.    The same internet protocol addresses used for the late March 2015 hack of the U.S. Robotics Company overlapped with the hacks of Law Firm 1 and 2.

110.    Based on information provided to the Staff by the U.S. Robotics Company and/or its cybersecurity vendor; by cybersecurity vendors retained by Law Firm 2 to investigate their hack; and the staff's review of firewall log data provided by Law Firm 1:

    a.  Malware used in connection with the late March 2015 hack of the U.S. Robotics Company and the early April 2015 Law Firm 2 emanated from the same IP address.

    b.  Moreover – in between the late March 2015 hack of the U.S. Robotics Company and the early April 2015 Law Firm 2 hack – that same IP address was used to interface with Law Firm 1's nonpublic network.

    c.  Furthermore, additional malware used in connection with the late March 2015 hack of the U.S. Robotics Company emanated from the same IP address to which stolen data was sent from the Law Firm 2 hack.

**M. Defendants Trade in Additional Securities Linked To Law Firm 2**

111.    Attached hereto as Exhibit KK is a true and correct copy of a summary of Defendants' and Relief Defendant's trading in the securities of additional companies after the hack of Law Firm 2.  Prior to the Pitney Bowes/Borderfree merger announcement, Defendants Hong and Chin purchased small amounts of Pitney Bowes shares.  These were in addition to the Borderfree shares Defendants purchased.  Additionally, Defendants opened stock positions in seven companies from May 1, 2015 through the end of 2015.  These seven companies spanned a diverse array of industries and included a book retailer, a business services company, a film production company, an oil and gas equipment manufacturer, a car rental company, an energy company, and an engineering equipment company.  The summary of Defendants' and Relief Defendant's trading in these securities was prepared at my direction and under my supervision by Commission staff.

112.    Based on information provided to the Staff by Law Firm 2, Pitney Bowes and these seven other companies were all either existing clients of Law Firm 2 and/or companies that Law Firm 2 had represented or was representing in connection with merger and acquisition transactions.

113.    For example, Partner B represented Pitney Bowes in its acquisition of Borderfree. Based on information obtained from Law Firm 2, Partner B also was involved in representing six of the seven other companies whose securities Defendants purchased.  Moreover – based on information obtained from Law Firm 2 – two of those companies were ones in which Law Firm 2 provided or was providing confidential representation in connection with merger or acquisition discussions.  These companies were also from varied sectors, as one was the energy company and the other was the engineering equipment company noted above.

### N.   Current Account Value of U.S. Based Accounts Held by the Defendants and Relief Defendant

114.    Based on a review of very recent brokerage records for the Interactive Brokers account with the account number ending *9328 in the name of Defendant Hong, the account has a current balance of approximately $11,000.

115.    Based on a review of very recent brokerage records for the Interactive Brokers account with the account number ending *2615 in the name of Relief Defendant Lai – that Defendant Hong used in the scheme – the account has a current liquidation value of approximately $65,000.

116.    Based on a review of very recent brokerage records for the Scottrade account with the account number ending *0256 in the name of Defendant Zheng, the account has a current value of approximately $140,000.

117.    Based on a review of brokerage records, Defendants Hong and Zheng have transferred proceeds from the fraudulent scheme to offshore bank accounts.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on December 27, 2016.

New York, NY

_____

Ricky Sachar