## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Securities and Exchange Commission, | |
| *Plaintiff,* | |
| v. | **Case No. 16-cv-9947 (VEC)** |
| Iat Hong, Bo Zheng, and Hung Chin, | **Judge Valerie E. Caproni** |
| *Defendants,* | |
| and | |
| Sou Cheng Lai, | |
| *Relief Defendant.* | |

## AFFIDAVIT OF RICKY SACHAR

DISTRICT OF COLUMBIA )
                        )    ss.:
CITY OF WASHINGTON   )

Ricky Sachar, being duly sworn, deposes and says:

1.       I am a member in good standing of the bars of the state of Maryland and the District of Columbia. I am employed by Plaintiff Securities and Exchange Commission ("SEC" or "Commission") as an Assistant Director in the Division of Enforcement in the Commission's Home Office in Washington, D.C.

2.       Except to the extent otherwise stated, I have personal knowledge of the matters set forth in this Declaration, and, if called as a witness, I could and would competently testify under oath to the facts stated herein.

3.       I submit this affidavit in support of the Commission's Order to Show Cause Why A Default Judgment Should Not Be Entered Against Defendants Iat Hong, Bo Zheng, Hung Chin, and Relief Defendant Sou Cheng Lai Pursuant To Federal Rule of Civil Procedure 55(b).

1

4.     This action arises from a fraudulent hacking-to-trade scheme.  In 2014 and 2015,

Iat Hong, Bo Zheng, and Hung Chin (collectively, "Defendants") directly, indirectly, or through

or by means of others hacked into the nonpublic networks of two New York-headquartered law

firms and secretly copied and removed emails of certain law firm partners to obtain confidential

information about corporate transactions for which the law firms were providing representation.

Defendants then used this confidential information to trade ahead of mergers and acquisitions

announcements involving three companies: InterMune, Inc. ("InterMune"), Altera Corporation

("Altera"), and Borderfree, Inc. ("Borderfree").  Defendants reaped approximately $3 million in

illegal profits by trading on the stolen material nonpublic information.  The fraudulent hacking-

to-trade scheme violated the Securities Exchange Act of 1934 ("Exchange Act") and

Commission rules enacted thereunder.

5.     The Commission seeks a final judgment by default that:

a.     Permanently enjoins Defendant Hong from violating § 10(b), § 14(e), and
§ 20(b) of the Exchange Act [15 U.S.C. § 78j(b), § 78n(e), and § 78t(b)]
and Rules 10b-5 and 14e-3 thereunder [17 C.F.R. § 240.10b-5 and §
240.14e-3];

b.     Orders Defendant Hong to disgorge $462,471.70, plus $34,063.78 in
prejudgment interest;

c.     Orders Defendant Hong to pay the maximum civil monetary penalty under
§ 21A of the Exchange Act: three times his disgorgement or
$1,387,415.10;

d.     Permanently enjoins Defendant Zheng from violating § 10(b) and § 20(b)
of the Exchange Act [15 U.S.C. § 78j(b) and § 78t(b)] and Rule 10b-5
thereunder [17 C.F.R. § 240.10b-5];

e.     Orders Defendant Zheng to disgorge $480,869.62, plus $29,630.42 in
prejudgment interest;

f.     Orders Defendant Zheng to pay the maximum civil monetary penalty
under § 21A of the Exchange Act: three times his disgorgement or
$1,442,608.86;

g.       Permanently enjoins Defendant Chin from violating § 10(b), § 14(e), and § 20(b) of the Exchange Act [15 U.S.C. § 78j(b), § 78n(e), and § 78t(b)] and Rules 10b-5 and 14e-3 thereunder [17 C.F.R. § 240.10b-5 and § 240.14e-3];

h.       Orders Defendant Chin to disgorge $1,009,038.74, plus $60,512.82 in prejudgment interest;

i.       Orders Defendant Chin to pay the maximum civil monetary penalty under § 21A of the Exchange Act: three times his disgorgement or $3,027,116.22; and

j.       Orders Relief Defendant Lai to disgorge $901,435.67, plus $60,398.19 in prejudgment interest.

5.      This affidavit and its accompanying exhibits — in addition to establishing the Court's subject matter jurisdiction and the Commission's entitlement to a default judgment — set forth the bases for the disgorgement and prejudgment interest sought by the Commission. The Complaint's well-pleaded allegations of liability, which now are deemed admitted by virtue of the Defendants and Relief Defendant's default, are incorporated herein.

### Basis for Default Judgment

7.      On December 27, 2016, the Commission filed its Complaint and *Ex Parte* Application For Temporary Restraining Order And Ancillary Equitable Relief And For An Order To Show Cause On A Preliminary Injunction ("the Application"). (Dkt. #4, 6.) The Court granted the Commission's Application the same day. (Dkt. #12.)

8.      The Court's December 27 Order provided for alternative service of process, permitting the Commission to serve the Order, all documents filed in support thereof, and all future documents to be served in this action by a number of methods. (*Id.*) Service by international express mail was expressly sanctioned for Defendants Hong and Chin and Relief

Defendant Lai, and service by email was expressly sanctioned for all Defendants and Relief Defendant Lai. (*Id.*)

9. On December 28, 2016, the Commission served each Defendant and Relief Defendant with a Summons; the Civil Cover Sheet; the Complaint; the Application; the Memorandum of Law in Support thereof; the Local Rule 6.1 Declaration of Ricky Sachar in support thereof; the Exhibits to the Declaration; and the December 27 Order.[1] (*See* Jan. 6, 2017 Dec. of Service, Dkt.#16.) Pursuant to the December 27 Order, the service package was sent by international express mail to Defendants Hong and Chin and Relief Defendant Lai, and the service package was emailed to all Defendants and Relief Defendant Lai. (*Id.*)

10. The Court's December 27 Order also required Defendants, Relief Defendant, or their attorneys to appear at a January 9, 2017 hearing and show cause why the temporary restraining order should not be converted into a preliminary injunction. (Dkt. #12.)

11. Defendants and Relief Defendant did not appear at the show cause hearing in person or through attorneys. Nor did the Defendants or Relief Defendant attempt in any other way to show cause why the Court should not enter a preliminary injunction extending the injunctive relief, asset freezes, repatriation order, and preservation order pending final adjudication on the merits.

12. On January 9, 2017, the Court converted the temporary restraining order into a preliminary injunction. (Dkt. #20.)

13. Pursuant to Federal Rule of Civil Procedure 5(a)(2), the Commission did not serve the January 9 Preliminary Injunction Order on Defendants or Relief Defendant because

---

[1] The Securities and Exchange Commission ("Commission") also served Defendants and Relief Defendant with Plaintiff Securities and Exchange Commission's *Ex Parte* Motion to Partially Seal the Record and the Court's December 27 Order granting the same.

they were in default for failing to appear at the January 9 hearing or otherwise attempt to show cause in response to the Court's December 27 Order.

14.     On March 6, 2017, the Court ordered the Commission to move by March 21, 2017 for a default judgment against Defendants and Relief Defendant because they "have failed to appear or answer in this action." (Dkt. #23.)

15.     Pursuant to Federal Rule of Civil Procedure 55(a), the Commission applied on March 10, 2017 for entry of default by the Clerk of Court. (Dkt. #25, 25-1, 26.) The Clerk's Certificate of Default issued the same day and applies to all Defendants and Relief Defendant Lai. (Dkt. #28.)

16.     In compliance with Local Civil Rule 55.2(c), the Commission served all papers submitted in support of its Order To Show Cause Why A Default Judgment Should Not Be Entered Against Iat Hong, Bo Zheng, Hung Chin, And Sou Cheng Lai Pursuant To Federal Rule Of Civil Procedure 55(b), including this Affidavit and its supporting exhibits. The papers were sent by international express mail to Defendants Hong and Chin and Relief Defendant Lai. Although Local Civil Rule 55.2(c) explicitly calls for notice by mail, the default judgment papers were emailed to Defendant Zheng pursuant to the December 27 Order because he is a resident of the People's Republic of China. Service by mail cannot be effected in China because the country objected to that method of service under the Hague Convention of 15 November 1965 on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters. Art. 10(a), Nov. 15, 1965, 20 U.S.T. 361; People's Republic of China, Declarations, https://www.hcch.net/en/instruments/conventions/statustable/notifications/?csid=393&disp=resn ("to oppose the service of documents in the territory of the People's Republic of China by the methods provided by Article 10 of the Convention" including service by mail).

## Subject Matter Jurisdiction

17.     The Commission's claims in this action are for violations of the Securities Exchange Act of 1934 and Commission rules enacted thereunder: primary and secondary violations of § 10(b) and Rule 10b-5, primary violations § 14(e) and Rule 14e-3, and primary violations of § 20(b).

18.     Therefore, the Court has subject-matter jurisdiction over this action pursuant to § 27 of the Exchange Act, which gives the district courts of the United States "exclusive jurisdiction of violations of [the Exchange Act] or the rules and regulations thereunder." 15 U.S.C. § 78aa.

## Disgorgement

22.     I used records requested from U.S. brokerage firms to calculate the Defendants' and Relief Defendant's ill-gotten gains, as well as records that were obtained from foreign brokerage firms in cooperation with the Hong Kong Securities and Futures Commission.

23.     Using the brokerage records, I calculated Defendants' and Relief Defendant's disgorgement by subtracting how much Defendants' and Relief Defendant's paid for their InterMune, Altera, or Borderfree shares before the deals were announced from how much they sold their shares for after the deals were announced.  To calculate Defendants' and Relief Defendant's true net proceeds from the illegal trading, I then subtracted from the trading profits the commissions and fees that Defendants' and Relief Defendant paid on the trades.  The resulting figures represent reasonable approximations of Defendants' and Relief Defendant's ill-gotten gains. *See S.E.C. v. Tavella*, 77 F.Supp.3d 353, 360 (S.D.N.Y. 2015) ("A reasonable approximation of the amount to be disgorged is the difference between the amounts that each defendant obtained for his or her shares and the amount that that defendant stated that he or she paid for them . . . ." less any fees and commissions paid on the trades.).

6

## A. Defendant Hong's Disgorgement

24.     Defendant Hong used two brokerage accounts in his name to buy and sell InterMune and Altera shares.

25.     Hong earned substantial profits on his InterMune trading after a merger involving the company was announced on August 25, 2014.  He earned substantial profits on his Altera trading after a March 27, 2015 article in *The Wall Street Journal* reported that the company was involved in confidential merger discussions with Intel Corporation ("Intel").

26.     In total, Hong should disgorge $462,471.70 in ill-gotten gains on his unlawful InterMune and Altera trading.

### i.     Defendant Hong's InterMune Disgorgement

27.     From August 13, 2014 to August 21, 2014, Hong purchased 9,200 InterMune shares at prices ranging from $48.00 to $53.50 per share.  The shares were purchased through a cash account at Interactive Brokers, LLC ("Interactive Brokers") in Hong's name with an account number ending *6749 (hereinafter "Hong cash account").  The total purchase price was $457,455.

28.     On August 25, 2014, the InterMune merger was publicly announced.

29.     Hong then sold all 9,200 InterMune shares for $73.03 per share.  The total sales price was $671,876.

30.     Thus, Hong's InterMune trading profits were $214,421.

31.     For the InterMune trading, Hong paid $555 in commissions and fees.

32.     Subtracting the $555 in commissions and fees from Hong's $214,421 in trading profits results in true net proceeds of $213,866.  This is the amount that Hong should disgorge

because it represents a reasonable approximation of his ill-gotten gains on the illegal InterMune trading.

33.     Attached hereto as Exhibit 1 is a true and correct copy of the August 2014 statement for the Hong cash account. Exhibit 1 includes a business records certification from Interactive Brokers.

34.     I used this account statement to calculate Hong's disgorgement because the statement details Hong's InterMune trading. Page 3 of Exhibit 1 — in the row named "Total ITMN" — lists $213,866, which takes into account commissions and fees paid on the trades.

**ii.     Defendant Hong's Altera Disgorgement: BOCI Account**

35.     From March 3, 2015 to March 26, 2015, Hong purchased 25,644 Altera shares at prices ranging from $34.45 to $37.10 per share. The shares were purchased through a margin account at BOCI Securities Limited in Hong's name with an account number ending *1999 (hereinafter "Hong BOCI account"). The total purchase price was $935,085.92.

36.     On March 27, 2015 *The Wall Street Journal* reported that Altera was in merger discussions with Intel.

37.     Hong sold all 25,644 Altera shares on April 10, 2015 at prices ranging from $43.80 to $45.05 per share. The total sales price was $1,132,691.48.

38.     Hong's Altera trading profits in the BOCI account were $197,605.57.[2]

39.     For the Altera trading, Hong paid $2,782.99 in commissions and fees.

40.     Subtracting the $2,782.99 in commissions and fees from Hong's $197,605.57 in trading profits results in true net proceeds of $194,822.58. This is the amount that Hong should

---

[2]     This amount does not include the profits on Hong's March 30, 2015 purchase – and subsequent sale – of 5,000 Altera shares because that purchase and sale occurred after the March 27, 2015 article in *The Wall Street Journal*.

disgorge because it represents a reasonable approximation of his ill-gotten gains in the BOCI account on the illegal Altera trading.

41. Attached hereto as Exhibit 2 is a true and correct copy of the March and April 2015 account statements for the BOCI account. I used these statements to calculate Hong's disgorgement because they detail his Altera trading. Column five on the statements shows the price-per-share multiplied by the number of shares that Hong purchased or sold. Column six includes the fees and commissions that Hong paid on each trade.

### iii. Defendant Hong's Altera Disgorgement: Interactive Brokers Cash Account

42. From March 3, 2015 to March 24, 2015, Hong purchased 6,900 Altera shares at prices ranging from $35.10 to $36.62 per share. The shares were purchased through Hong's cash account at Interactive Brokers. The total purchase price was $248,134.72.

43. On March 27, 2015 *The Wall Street Journal* reported that Altera was in merger discussions with Intel.

44. Hong sold all 6,900 Altera shares on April 10, 2015 at prices ranging from $43.78 to $43.85 per share. The total sales price was $302,293.41.

45. Hong's Altera trading profits in his cash account were $54,158.69.[3]

46. For the Altera trading, Hong paid $357.57 in commissions and fees.[4]

---

[3] This amount does not include the profits on Hong's March 30, 2015 purchase – and subsequent sale – of 1,000 Altera shares because that purchase and sale occurred after the March 27, 2015 article in *The Wall Street Journal*.

[4] To exclude the 1,000 Altera shares Hong purchased after *The Wall Street Journal* article from the calculations, I calculated the fees Hong paid on the 7,900 shares that he sold on April 10, 2015 shares in the following manner: Hong's fees on the 7,900-share Altera sale were $193, as reflected at Exhibit 3. To ensure that the fees applied only to the 6,900 Altera shares that Hong purchased prior to *The Wall Street Journal* article, I divided 6,900 by 7,900, and multiplied that by 100. The resulting percentage was 87.3%. I then multiplied that percentage by the total $193 fee, which equaled $168.57. That is the fee that I attributed to Hong's sale of the 6,900 Altera shares that he purchased prior to *The Wall Street Journal* article. I conducted similar calculations to exclude

47.     Subtracting the $357.57 in commissions and fees from Hong's $54,158.69 in trading profits results in true net proceeds of $53,783.12. This is the amount that Hong should disgorge because it represents a reasonable approximation of his ill-gotten gains in the Interactive Brokers cash account on the illegal Altera trading.

48.     Attached hereto as Exhibit 3 is a true and correct copy of the of the March and April 2015 account statements for the Interactive Brokers cash account. Exhibit 3 includes a business records certification from Interactive Brokers.

49.     I used the account statements to calculate Hong's disgorgement because they detail his Altera trading. The account statements contain a "Fees" column that lists the fees for each Altera trade.

### B. Defendant Zheng's Disgorgement

50.     Defendant Zheng used three brokerage accounts in his name to buy and sell InterMune and Altera shares.

51.     Zheng earned substantial profits on his InterMune trading after a merger involving the company was announced on August 25, 2014. He earned substantial profits on his Altera trading after a March 27, 2015 article in *The Wall Street Journal* reported that the company was involved in confidential merger discussions with Intel.

52.     In total, Zheng should disgorge $480,868.40 in ill-gotten gains on his unlawful InterMune and Altera trading.

---

the fees for the Altera shares that Defendants Zheng and Chin and Relief Defendant Lai purchased and sold after *The Wall Street Journal* article.

### i. Defendant Zheng's InterMune Disgorgement

53.   From August 18, 2014 to August 19, 2014, Zheng purchased 1,900 InterMune shares at $53.50 per share.  The shares were purchased through an account at CMB International Securities Limited in Zheng's name with an account number ending *2232 (hereinafter "Zheng CMB account").  The total purchase price was $96,300.

54.   On August 25, 2014, the InterMune merger was publicly announced.

55.   Zheng then sold all 1,900 InterMune shares at $73.00 per share.  The total sales price was $131,400.

56.   Zheng's InterMune trading profits were $35,100.

57.   For the InterMune trading, Zheng paid $683.11 in commissions and fees.

58.   Subtracting the $683.11 in commissions and fees from Zheng's $35,100 in trading profits results in true net proceeds of $34,416.89.  This is the amount that Zheng should disgorge because it represents a reasonable approximation of his ill-gotten gains on the illegal InterMune trading.

59.   Attached hereto as Exhibit 4 is a true and correct copy of the August 2014 account statement for Zheng's CMB account.   I used this statement to calculate Zheng's disgorgement.  Specifically, I added the entries in the Debit columns for Zheng's two InterMune purchases (which include commissions and fees).  Then I subtracted the Debit amount from the entry in the Credit column that reflects the proceeds of Zheng's InterMune sales (which includes commissions and fees).

### ii. Defendant Zheng's Altera Disgorgement: BOCI Account

58.   From February 25, 2015 to March 27, 2015, Zheng purchased 54,000 Altera shares at prices ranging from $34.42 to $37.10 per share.  The shares were purchased through a

margin account at BOCI Securities Limited in Zheng's name with an account number ending *1975 (hereinafter "BOCI account"). The total purchase price was $1,950,851.45.

59.     On March 27, 2015, *The Wall Street Journal* reported that Altera was in merger discussions with Intel.

60.     Zheng sold all 54,000 Altera shares on April 10, 2015 at prices ranging from $43.60 to $45.00 per share. The total sales price was $2,378,340.50.

61.     Zheng's Altera trading profits in his BOCI account were $427,489.05.[5]

62.     For the Altera trading, Zheng paid $5,316.13 in commissions and fees.

63.     Subtracting the $5,316.13 in commissions and fees from Zheng's $427,489.05 in trading profits results in true net proceeds of $422,172.92. This is the amount that Zheng should disgorge because it represents a reasonable approximation of his ill-gotten gains on the illegal Altera trading in his BOCI account.

64.     Attached hereto as Exhibit 5 is a true and correct copy of the March and April 2015 account statements for Zheng's BOCI account. I used this statement to calculate Zheng's disgorgement. Column five on the statements shows the price-per-share multiplied by the number of Altera shares that Zheng purchased or sold. Column six includes the fees and commissions that Zheng paid on each trade.

### iii.     Zheng's Altera Disgorgement: Scottrade Account

65.     From March 2, 2015 to March 25, 2015, Zheng purchased 3,264 Altera shares at purchase prices ranging from $35.20 to $36.90 per share. The shares were purchased through an account at Scottrade, Inc. ("Scottrade") in Zheng's name with an account number ending *0256 (hereinafter "Zheng Scottrade account"). The total purchase price was $118,125.95.

---

[5]     This amount does not include the profits on Zheng's March 30, 2015 purchase – and subsequent sale – of 1,200 Altera shares because that purchase and sale occurred after the March 27, 2015 article in *The Wall Street Journal*.

66.     On March 27, 2015, *The Wall Street Journal* reported that Altera was in merger discussions with Intel.

67.     Zheng sold all 3,264 Altera shares on April 10, 2015 at prices ranging from $43.60 to $43.80 per share. The total sales price was $142,463.20.

68.     Zheng's Altera trading profits in his Scottrade account were $24,337.25.[6]

69.     For the Altera trading, Zheng paid $57.44 in commissions and fees to Scottrade.

70.     Subtracting the $57.44 in commissions and fees from Zheng's $24,337.25 in trading profits results in true net proceeds of $24,279.81. This is the amount that Zheng should disgorge because it represents a reasonable approximation of his ill-gotten gains on the illegal Altera trading in his Scottrade account.

71.     Attached hereto as Exhibit 6 is a true and correct copy of the March and April 2015 statements for Zheng's Scottrade account, as well as a trade blotter produced to the Commission by Scottrade. I used the statements and trade blotter to calculate Zheng's disgorgement because they detail Zheng's Altera trades and the commissions and fees that he paid thereon. In particular, the trade blotter contains a column called "Commission and SEC Fees" that lists the commissions and fees paid on each Altera trade.

### C. Defendant Chin's Disgorgement

72.     Defendant Chin used a brokerage account in his name to buy and sell Altera and Borderfree shares.

73.     Chin earned substantial profits on his Altera trading after a March 27, 2015 article in *The Wall Street Journal* article reported that the company was involved in confidential merger

---

[6]     This amount does not include the profits on Zheng's April 2, 2015 purchase – and subsequent sale – of 2,236 Altera shares because that purchase and sale occurred after the March 27, 2015 article in *The Wall Street Journal*.

discussions with Intel. He earned substantial profits on his Borderfree trading after a tender offer for the company was announced on May 6, 2015.

74.     In total, Chin should disgorge $1,009,038.74 in ill-gotten gains on his unlawful Altera and Borderfree trading.

### i.     Chin's Altera Disgorgement

75.     From February 17, 2015 to March 27, 2015, Chin purchased 70,000 Altera shares at prices ranging from $34.67 to $36.71 per share. The shares were purchased through an account at BOCI Securities Limited in Chin's name with an account number ending *6696 ("Chin's BOCI account"). The total purchase price was $2,502,737.25.

76.     On March 27, 2015, *The Wall Street Journal* reported that Altera was in merger discussions with Intel.

77.     Chin sold all 70,000 Altera shares on April 10, 2015 at prices ranging from $43.51 to $45.00 per share. The total sales price was $3,091,814.10.

78.     Chin's Altera trading profits were $589,076.85.[7]

79.     For the Altera trading, Chin paid $6,733.36 in commissions and fees.

80.     Subtracting the $6,733.36 in commissions and fees from Chin's $589,076.85 in trading profits results in true net proceeds of $582,343.49. This is the amount that Chin should disgorge because it represents a reasonable approximation of his ill-gotten gains on the illegal Altera trading.

81.     Attached hereto as Exhibit 7 is a true and correct copy of the February, March and April 2015 account statements for Chin's BOCI account. I used this statement to calculate Chin's disgorgement. Column five on the statements shows the price-per-share multiplied by the

---

[7]     This amount does not include the profits on Chin's March 31, 2015 purchase – and subsequent sale – of 5,000 Altera shares because that purchase and sale occurred after the March 27, 2015 article in *The Wall Street Journal*.

number of Altera shares that Chin purchased or sold. Column six includes the fees and commissions that Chin paid on each trade.

### ii.     Chin's Borderfree Disgorgement

82.     From April 29, 2015 to May 5, 2015, Chin purchased 57,000 Borderfree shares at prices ranging from $6.36 to $6.54 per share. The shares were purchased through Chin's BOCI account. The total purchase price was $367,690.45.

83.     On May 6, 2015 Pitney-Bowes, Inc. ("Pitney-Bowes") announced that it was acquiring Borderfree in a tender offer.

84.     Chin sold all 57,000 Borderfree shares on May 11, 2015 and May 12, 2015 at prices ranging from $13.96 to $13.97 per share. The total sales price was $795,896.50.

85.     Chin's Borderfree trading profits were $428,206.05.

86.     For the Borderfree trading, Chin paid $1,510.80 in commissions and fees.

87.     Subtracting the $1,510.80 in commissions and fees from Chin's $428,206.05 in trading profits results in true net proceeds of $426,695.25. This is the amount that Chin should disgorge because it represents a reasonable approximation of his ill-gotten gains on the illegal Borderfree trading.

88.     Attached hereto as Exhibit 8 is a true and correct copy of the May 2015 account statement for Chin's BOCI account. I used this statement to calculate Chin's disgorgement. Column five on the statements shows the price-per-share multiplied by the number of Borderfree shares that Chin purchased or sold. Column six includes the fees and commissions that Chin paid on each trade.

### D. Relief Defendant Lai's Disgorgement

89.     Brokerage accounts in the name of Relief Defendant Lai were used to buy and sell shares of InterMune, Altera, and Borderfree.

90.     The trading in these accounts was executed by Defendant Hong who controlled the accounts and had full trading authority over them.

91.     Hong earned substantial profits trading InterMune, Altera, and Borderfree securities in Relief Defendant Lai's accounts. These profits were ill-gotten gains because Hong purchased the securities while in possession of material nonpublic information that was stolen from the hacked law firms.

92.     In total, Hong's unlawful trading generated $901,435.67 in ill-gotten gains in Relief Defendant Lai's accounts, which she should be ordered to disgorge.

#### i.     Relief Defendant Lai's InterMune Disgorgement

93.     From August 13, 2014 to August 18, 2014, Hong purchased 7,000 InterMune shares at prices ranging from $48.32 to $53.50. The shares were purchased through a cash account at Interactive Brokers in Relief Defendant Lai's name with an account number ending *5376 (hereinafter "Lai's cash account"). The total purchase price was $366,760.

94.     On August 25, 2014, the InterMune merger was publicly announced.

95.     Hong then sold all 7,000 InterMune shares in Lai's cash account at prices ranging from $72.91 to $72.93 per share. The total sales price was $510,460.

96.     Hong's InterMune trading profits in Lai's cash account were $143,700.

97.     For the InterMune trading, $420 in commissions and fees were paid out of Lai's cash account.

98.     Subtracting the $420 in commissions and fees from Hong's $143,700 in trading

profits results in true net proceeds of $143,280 in Lai's cash account. This is the amount that

Relief Defendant Lai should disgorge because it represents a reasonable approximation of the ill-

gotten gains on the illegal InterMune trading.

99.     Attached hereto as Exhibit 9 is a true and correct copy of the August 2014

statement for Lai's cash account. Exhibit 9 includes a business records certification from

Interactive Brokers.

100.    I used this statement to calculate Relief Defendant Lai's disgorgement because

the statement details the illicit InterMune trading in Lai's cash account. Page 3 of Exhibit 9 – in

the row named "Total ITMN" – lists $143,280, which takes into account commissions and fees

paid on the trades.

**ii.      Relief Defendant Lai's Altera Disgorgement**

100.    From February 17, 2015 to March 24, 2015, Hong purchased 47,600 Altera shares

at prices ranging from $34.84 to $37.10 per share. The shares were purchased through a margin

account at Interactive Brokers in Relief Defendant Lai's name with an account number ending

*2615 (hereinafter "Lai's margin account"). The total purchase price was $1,718,102.16.

101.    On March 27, 2015, *The Wall Street Journal* reported that Altera was in merger

discussions with Intel.

102.    Hong sold all 47,600 Altera shares in Lai's margin account on April 10, 2015 at

prices ranging from $43.75 to $44.36 per share. The total sales price was $2,063,483.03.

103.    Thus, Hong's Altera trading profits in Lai's margin account were $345,380.87.[8]

---

[8]     This amount does not include any profits earned on the 3,600 Altera shares that were sold prior to the
March 27, 2015 article. Moreover, this amount does not include profits on Lai's March 30, 2015 purchase – and
subsequent sale – of 13,500 Altera shares because those purchases and sales occurred after the March 27, 2015 *Wall
Street Journal* article.

104.     For the Altera trading, $2,581.67 in commissions and fees were paid out of Lai's margin account.

105.     Subtracting the $2,581.67 in commissions and fees from Hong's $345,380.87 in trading profits results in true net proceeds of $342,799.20 in Lai's margin account. This is the amount that Relief Defendant Lai should disgorge because it represents a reasonable approximation of the ill-gotten gains on the illegal Altera trading.

106.     Attached hereto as Exhibit 10 is a true and correct copy of the February, March, and April 2015 statements for Lai's margin account. Exhibit 10 includes a business records certification from Interactive Brokers.

107.     I used these statements to calculate Relief Defendant Lai's disgorgement because the statements detail the illicit Altera trading in Lai's margin account. The account statements contain a "Fees" column that lists the fees for each Altera trade.

### iii.     Relief Defendant Lai's Borderfree Disgorgement

107.     From April 29, 2015 to May 5, 2015, Hong purchased 56,000 Borderfree shares at prices ranging from $6.32 to $6.75 per share. The shares were purchased through Lai's margin account. The total purchase price was $363,618.10.

108.     On May 6, 2015, Pitney-Bowes announced that it was acquiring Borderfree in a tender offer.

109.     Hong sold all 56,000 Borderfree shares in the Lai margin account from May 11, 2015 through May 19, 2015 at prices ranging from $13.96 to $13.97 per share. The total sales price was $781,889.55.

110.     Thus, Hong's Borderfree trading profits in Lai's margin account were $418,271.45.

111.    For the Borderfree trading, $2,914.98 in commissions and fees were paid out of Lai's margin account.

112.    Subtracting the $2,914.98 in commissions and fees from Hong's $418,271.45 in trading profits results in true net proceeds of $415,356.47 in Lai's margin account. This is the amount that Relief Defendant Lai should disgorge because it represents a reasonable approximation of the ill-gotten gains on the illegal Borderfree trading.

113.    Attached hereto as Exhibit 11 is a true and correct copy of the May 2015 statement for Lai's margin account. Exhibit 11 includes a business records certification from Interactive Brokers.

114.    I used the April 2015 statement at Exhibit 10 and Exhibit 11 to calculate Relief Defendant Lai's disgorgement because the statements detail the illicit Borderfree trading in Lai's margin account. Page 4 of Exhibit 11 — in the row named "Total BRDR" — reflects the commissions and fees paid on the Borderfree trades. The "Realized P/L," which is $415,356.47, is the true net proceeds on the Borderfree trading.

### Prejudgment Interest

115.    To calculate prejudgment interest, the Commission uses a computerized Prejudgment Interest Calculator ("PJIC"). The PJIC calculates interest on the violation amount from the date of the violation until the date the judgment is paid off by the violator. Partial months are ignored; violations that occur at any time during the month are treated as having occurred at the end of the month, and payoffs that occur at any time during the month are treated as having occurred at the beginning of the month. The interest rate used by the PJIC is the Internal Revenue Service's interest rate on tax underpayments, which is set forth in 26 U.S.C. §

6621(a)(2) and approved by the Second Circuit in *S.E.C. v. First Jersey Securities, Inc.*, 101 F.3d 1450, 1476 (2d Cir. 1996).

116.     Funds that are frozen at the government's behest are not subject to prejudgment interest. *See S.E.C. v. Razmilovic*, 738 F.3d 14, 36–38 (2d Cir.2013).

117.     If the funds frozen are less than the total disgorgement, however, the Commission remains entitled to prejudgment interest on the portion of the ill-gotten gains that exceeds the amount of the asset freeze. *Cf., S.E.C. v. Contorinis*, 743 F.3d 296, 308 (2d Cir. 2014) ("The amount on which a violator must pay prejudgment interest usually tracks the amount that the party is ordered to disgorge."); *S.E.C. v. Wyly*, 56 F.Supp.3d 394, 433 (S.D.N.Y. 2014) ("That defendants appear to have spent these gains should not preclude the court from requiring the payment of prejudgment interest.  Disgorgement, which includes the award of prejudgment interest, would have no deterrent value if defendants could avoid it by spending their unlawful gains before the government discovers the fraud.").

118.     The Court's December 27 Order froze funds belonging to Defendants' and Relief Defendant.  The Commission deducted the frozen funds from its prejudgment interest calculations as of the date of the Court's Order: December 27, 2016.  The Commission chose to deduct the frozen funds from the prejudgment interest on the Altera disgorgement because each Defendant and Relief Defendant earned ill-gotten gains on the Altera trading.  Further, the Altera trading was Defendants' and Relief Defendant's largest and most profitable trading.

119.     The total funds frozen pursuant to the Court's December 27 Order are substantially less than Defendants' and Relief Defendant's disgorgement.  Therefore, the Commission is seeking prejudgment interest on the ill-gotten gains that exceed the frozen funds.

120.     To account for the impact of the frozen funds while continuing to accrue prejudgment interest on the excess disgorgement, I calculated prejudgment interest as follows:

a.     For Altera: I calculated prejudgment interest on the full disgorgement figure for each Defendant and Relief Defendant from April 10, 2015 (the violation date) to December 27, 2016 (the date the funds were frozen). Then I deducted the frozen funds from the total disgorgement figure for each Defendant and Relief Defendant.  On the remaining amount, I calculated prejudgment interest from December 27, 2016 until March 9, 2017 (the payoff date that I selected for the PJIC).

b.     For InterMune: I calculated prejudgment interest on the full disgorgement figure for Defendants Hong and Zheng and Relief Defendant Lai from August 25, 2014 (the violation date) to March 9, 2017.

c.     For Borderfree: I calculated prejudgment interest on the full disgorgement figure for Defendant Chin and Relief Defendant from the date of their last Borderfree sales (May 12, 2015 for Chin and May 19, 2015 for Lai) to March 9, 2017.

### A. Defendant Hong's Prejudgment Interest

121.     Defendant Hong's ill-gotten gains on the InterMune and Altera trading totaled $462,471.70.

122.     His combined prejudgment interest is $34,063.78.

### i.     Defendant Hong's Altera Prejudgment Interest

122.     On April 10, 2015, Hong sold his Altera shares and earned ill-gotten gains of $248,605.70. The prejudgment interest that accrued on this amount from April 10, 2015 until the